MUNITIONS CARRIERS CONFER-
ENCE, INC.; Consolidated Freight-
ways; Pacific Intermountain Express;
Riss & Company, Inc.; Tri-State Motor
Transit Company; Illinois California
Express, Inc.; Ringsby Truck Lines,
Inc., and IML Freight Inc., Plaintiffs,

v.

AMERICAN FARM LINES, a Coopera-
tive Marketing Association; Howard
McCormack and E. E. Strohfield, De-
fendants,

Interstate Commerce Commission,
Intervening Plaintiff.

Civ. No. 68–148.

United States District Court
W. D. Oklahoma.

July 24, 1969.

See also 10 Cir., 415 F.2d 747.

Harry F. Horak and J. F. Walker, I. C. C., Fort Worth, Tex., and Bernard A. Gould, I. C. C., Washington, D. C., for intervening plaintiff.

James M. Robinson and William L. Peterson, Jr., of Hanson, Fisher, Tumilty, Peterson & Tompkins, Oklahoma City, Okl., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

EUBANKS, District Judge.

### FINDINGS OF FACT

The plaintiffs herein filed on April 9, 1969, a Petition for an order to show cause why disobedient parties should not be punished for civil contempt with respect to the permanent injunction entered in this cause on May 28, 1968. An order to show cause was entered hereon on April 9, 1969, and duly served upon each of the defendants.

Hearing was held before the Court on May 26 through May 29, 1969, at Oklahoma City, Oklahoma, with the plaintiffs appearing by their attorneys, Ben Franklin and Grey W. Satterfield, defendants by their attorneys, James M. Robinson, William L. Peterson, Jr., and Raymond E. Tompkins, and the intervenor by its attorney, Harry F. Horak. The Court, in reaching its conclusions, has considered the pleadings, evidence, stipulations, and arguments of counsel.

The pertinent ordering portion of the permanent injunction of May 28, 1968, reads as follows:

It is further ordered, adjudged and decreed that Plaintiffs' Motion for Summary Judgment should be, and the same is hereby sustained and that defendants, American Farm Lines, Howard McCormack, and E. E. Strohfield, and defendants' other officers, agents, employees and representatives should be, and the same are hereby permanently enjoined from the for-hire transportation in interstate or foreign commerce of any products other than those products mentioned in Section 1141j of Title 12 U.S. Code,

Grey W. Satterfield of Franklin, Harmon & Satterfield, Oklahoma City, Okl., for plaintiffs.

except under one of the following circumstances:

(a) When proceeding to pick up and transport a shipment of products contemplated by Section 1141j of Title 12, U.S. Code when necessary to prevent proceeding with an empty vehicle movement.

(b) When returning from the delivery of a shipment of products contemplated by Section 1141j of Title 12, U.S. Code when necessary to prevent an empty vehicle movement.

Said injunction shall remain in full force and effect until such time, if at all, as there is in force with respect to said defendants, appropriate authority from the Interstate Commerce Commission authorizing them to engage in such operations.

A companion cause with the same parties was determined by this Court in No. 67–487 Civil, and the record therein was incorporated in the instant action in No. 68–148 Civil.

Oral and documentary evidence was adduced. Six different types of motor transportation by defendant American Farm Lines in interstate commerce were outlined and described by the plaintiffs in their evidence as being in contravention of the above-quoted injunction. Contra evidence and exhibits were proffered by the defendants to show compliance therewith. Each type of operation will be discussed in this opinion.

■ The first deals with operations termed by the plaintiffs as "long layover" counts and are represented by Exhibits 28 through 48. Generally, these involve a westbound shipment of explosives moving on a Government bill of lading and an eastbound shipment of canned goods for a member of American Farm Lines. For example, in Exhibit 33, a Government shipment of explosives was transported from Crane, Indiana, to Bangor, Washington, arriving at the latter point at midnight on November 19, 1968. The vehicles, Tractor 627 and Trailer V773, and driver laid over at Bangor for unloading for 157½ hours

until November 26. The same vehicles and driver then deadheaded empty for 885 miles to Modesto, California, where they again laid over, awaiting a member load, for 174½ hours until December 4 before proceeding eastward to Omaha, Nebraska. Another example is Exhibit 29 wherein a Government explosive load was transported from Oklahoma City, Oklahoma, to Concord, California, where it laid over 79 hours, then deadheaded empty for 80 miles to Stockton, California, where another layover of 64 hours occurred and then a member shipment was transported to Oklahoma City. This round trip was made in the period from November 17 to 27, 1968. It is plaintiffs' contention that these layovers evidence a violation of the injunction because defendant American Farm Lines could not have been proceeding westbound with the Government shipment with the intention to pick up and transport a specific member shipment on the west coast. Defendants' evidence and exhibits indicate that most of these layovers occurred about and during the Thanksgiving weekend when its members' plants were closed. It appears, however, from the testimony of Don Landrum, dispatcher for American at Oklahoma City, that the westbound Government loads are not dispatched for the purpose of picking up specific member loads on the west coast. His testimony was that the vehicle transporting the westbound Government load is not available for further dispatch until the Government shipment is unloaded. The Court concludes that the westbound shipments on Government bills of lading are unlawful and in contravention of the injunction of this Court because the vehicles were not proceeding to pick up and transport a shipment of products contemplated by the injunction and Section 1141j of Title 12, U.S. Code. In addition, the Court is of the opinion that the Government shipments to Bangor, Washington, as described in Exhibit 33, are unlawful and in violation of the injunction for the further reason, as defendants well knew, that it was never

contemplated by this Court that the defendants could carry Government freight ostensibly on a trip to pick up a member load when the member load was 800 miles away from the destination of the Government freight. Other instances of similar Government shipments to Bangor and eastbound member shipments from the California Bay area are reflected in Exhibits 7, 28, 33, 34, 36, 37, 40, 41, 42, 45, 47, D1–21–A, D1–25–A, D1–26–A, D1–27–A, D3–4–B, D3–12–B, D3–15–B, D3–16–A, D3–17–D, D3–18–A, and D3–18–C.

Two additional round trips involving Government shipments to Bangor and member moves on return from California were testified to by Allen M. Crosby and David Loftin in their respective depositions.

■■ The second type of transportation by defendant American Farm Lines are called "sandwich" moves by the plaintiffs. These are documented in Exhibits 2, 5, 7, 11, 12, and 49 through 55. Typical is Exhibit 2 wherein American transported Government traffic from Joliet, Illinois, to Hill Airforce Base, Utah, thence moved a load of grain from Nephi, Utah, to Brawley, California, for member Farmers Grain Cooperative, and thence a Government shipment from Norton Airforce Base, California, to Lake City, Missouri. Plaintiffs contend that this round trip constitutes, in fact, back-to-back movements of Government traffic within the purview of the injunction and that the sandwiched movement of grain is a subterfuge to defeat the prohibitions of the injunction. Defendants contend that it is a bona fide member movement with Farmers Grain Cooperative having become a member of American Farm Lines in July, 1968, and that it avoids the otherwise deadhead miles from Utah to California if it did not have this haul. The Court finds with respect to the round trip in Exhibit 2, discussed above, that the Government haul from Joliet to Hill Airforce Base produced transportation revenue of $1,817.47, the member grain haul from Utah to California brought in $150.00, and the Government haul from California to Missouri produced $694.00. Thus, on this round trip, Government revenue totaled $2,511.47 whereas membership revenue was merely $150.00. From a mileage standpoint the grain haul from Nephi to Brawley was 833 miles. Deadhead empty miles because of this grain haul were 30 miles from Hill Airforce Base to Ogden, 280 miles from Brawley to Norton Airforce Base, for a total of 310 miles. Out-of-pocket expense per mile of operation was testified to be 45 cents. It was also testified that the deadhead miles from Utah to California without the grain haul was 808 miles. Mathematical computations thus indicate that the cost to American without the grain haul would have been $363.60, whereas the cost to it with the grain haul is $364.35. These figures will vary in each instance depending upon the origin and destination of the Government shipments, but the question arises—how does this grain haul benefit American other than to sandwich a member haul between two Government shipments on the same round trip? The next question is whether the Government hauls meet the necessary and incidental tests of Northwest Agricultural Cooperative Association v. Interstate Commerce Commission, 9 Cir., 350 F.2d 252, wherein it was stated:

* * * on the uncontradicted facts Northwest's transportation of nonfarm products and supplies was incidental and necessary to its farm-related transportation both in *character* and *amount*—incidental because limited to otherwise empty trucks returning from hauling member farm products to market and producing a *small return* in proportion to Northwest's *income from trucking farm products* and farm supplies; necessary because *it is not economically feasible to* operate the trucks empty on return trips and because the additional income obtained is no more than that required to render performance of the cooperative's primary farm transportation

service financially practicable (Italics supplied)

The Court concludes that the Government hauls herein were not incidental and necessary to the grain haul. Defendants have tendered evidence that the eastbound movement prior to the first Government shipment was a member shipment and that the westbound movement following the last Government haul was also a member shipment. However, defendant Howard McCormack, general manager of American, testified that a round trip commences with the westbound haul from the home base territory and ends with the eastbound haul back to that area. Hence, the round trip here begins and ends with the Government hauls. Defendants have introduced Exhibits 6B1 through 6B34 showing Government hauls to Hill Airforce Base, Utah, the grain haul from Utah to California, and then a member haul back to the Midwest. These appear to be proper and lawful as cooperative movements but the same cannot be concluded when this grain haul is sandwiched between two Government shipments. The Court concludes that in those instances when the round trip includes a Government haul, then a member grain haul as shown here, followed by another Government haul—all on the same round trip—the Government movements are unlawful, are not necessary and incidental to the member grain haul, are not exempt under Title 49, Section 303(b) (5), U.S. Code, and are in violation of the provisions of the instant injunction.

■ Plaintiffs introduced evidence with respect to four other types of operations being performed by the defendants. These include so-called "bobtail" operations such as moving a Government shipment to Bangor, Washington, then dropping the loaded trailer and deadheading the tractor back to Oklahoma City, pulling another empty trailer to Springfield, Missouri, and then moving a trailer with a Government shipment to Bangor, all as shown in Exhibit 26. The second operation involves the back-to-back movement of Government ship-

ments by the same tractor but using different trailers, as shown in Exhibits 3, 4, 6, 8, 9, 10, and 15. The third type is described as a "shuttle" operation where one tractor is used to pull empty and loaded trailers between shipping installations and the terminals of American at Oklahoma City or Springfield, Missouri, as shown in Exhibits 13, 14, 16, 17, 18, and 19. Since the entry of the injunctions herein and in the companion case, the defendants had adopted the practice of following the trailers in complying with the back-to-back prohibitions thereof. In other words, if a trailer moved a Government or nonmember shipment, its next shipment had to be a member haul. Records were kept upon this basis to assure compliance with the injunctions. Little or no attention was paid to the tractor in this respect. The Court is aware of the novelty of this point. The back-to-back prohibitions of these injunctions did not cover this point. Nor is the Court aware of any prior expressions on this point by the Commission or any court with regard to the incidental and necessary tests. The first official recognition of this issue was on May 7, 1969, when the Interstate Commerce Commission, intervenor herein, adopted rules and regulations in Ex Parte No. MC–75, Implementation of Public Law 90–433—Agricultural Cooperative Transportation Exemption, reported in 108 M.C.C. 799. One of the rules adopted to be known as 49 CFR 1047.21(a) reads as follows:

(a) The phrase "incidental to its primary transportation operation and necessary for its effective performance" means that the interstate transportation of the cooperative association or federation of cooperative associations for nonmembers as described above is performed *with the same trucks or tractors* employed in a prior or subsequent trip in the primary transportation operation of the cooperative association or federation, that it is not economically feasible to operate the *trucks or tractors* empty on return trips (outbound trips in cases

where the primary transportation operation is inbound to the association or federation), and that the additional income obtained from such transportation is necessary to make the primary transportation operation financially practicable. (Italics supplied)

These regulations became effective on July 7, 1969. Under this regulation, cooperative associations or federations will be required to follow the tractor or truck rather than the trailer. Upon the basis of the record herein, the Court cannot conclude that the defendants are in deliberate violation of the injunction herein with respect to these three types of operations.

In the fourth instance defendants transported Government freight on trailer V–670 from Oakland, California to Oklahoma City thence to McAlester where it unloaded. This empty trailer was then pulled back to Oklahoma City and from there to Crane, Indiana where it was loaded with Government freight and then pulled to Bangor, Washington. These movements took place between October 31 and November 29 and involved four different tractors. At first blush these movements would seem to be a direct violation of both the letter and the spirit of the injunction. The defendants make a lame attempt to justify the operation by pointing out that a member load was delivered at San Francisco on this trailer immediately prior to the loading of Government freight at Oakland and that a member load was taken on at Hood River, Oregon, shortly after off-loading at Bangor so by attaching the two member loads to the front and back of the whole movement and treating the trips as separate and severed at either McAlester, Oklahoma City or Crane there would be no back-to-back trailer violation. While I cannot accept such contention I do excuse this movement as being inadvertent and unintentional. I am firmly convinced that defendants made a studied and diligent effort to avoid this particular type of back-to-back trailer movement so as to appear to be in compliance with the let-

ter of that part of my earlier comments in companion Case No. 67–487, to-wit:

"The cooperative may, in my opinion, haul nonfarm, nonmember products for hire without an I.C.C. permit in returning from the delivery of member owned and produced products or may haul nonfarm, nonmember products for hire in going after a load of member owned and produced products and not transgress applicable statutes."

while simultaneously, completely and deliberately ignoring the spirit and the letter of the latter injunction order entered in the instant case which provides, as heretofore set out, that nonmember freight may be hauled only

*"when necessary to prevent proceeding with an empty vehicle movement."*

Defendants contend the injunction is vague and indeed once sought clarification but I find the order is clear and understandable on the type of operations that are found to be in violation. Defendants are exonerated in the areas where there might be some ambiguity.

█ Many of the exhibits in evidence depict eastbound Government shipments transported by American from California points to the Midwest. Although not categorized among the six others these eastbound Government shipments are found illegal. Representatives of two members of American, namely, Taylor Merriman of Tri-Valley Growers and Mr. Loney of California Canners and Growers (Kal-Kan), testified to the overwhelming needs of their concerns for the eastbound transportation services of American. Mr. Loney averred that his firm could give a shipment to American whenever one of its vehicles made an appearance. This being true, it follows that American was unlawfully transporting the eastbound Government shipments contrary to the injunction herein. The fallacy of defendants' argument contending for the lawfulness of these eastbound Government shipments is that the cooperative membership hauling has not been its first concern. Al-

though defendant McCormack testified that membership shipments were given first consideration, the facts of record do not support his statement. Its Government hauling appears to be its first concern. The thrust of the involved statutes, case law on the subject, and the injunction herein is that the cooperative farm transportation must come first and the other transportation—nonmembership and Government—should be used to fill in to prevent an otherwise empty movement of the vehicle used in accomplishing the farm cooperative movement. In addition to the eastbound Government shipments in the above-discussed "sandwich" moves, others are shown in Exhibits 1, D3-2-A, D3-3-A, D3-4-A, D3-7-A, D3-8-A, D3-9-A, D3-10-A, D3-17-B, D3-17-C, D3-17-G, D3-17-H, and D3-17-I.

Despite defendants' claims that they have made a "positive effort" not to violate this Court's orders and that they do not "look for" non-member business and that such business is only used when their member business is in "imbalance," additional facts were developed by the evidence which, while not directly supportive of any of the six types of transportation movements complained of by plaintiffs, are demonstrative of the general devotion of defendants to their government traffic and their preferential handling of such over the traffic of their own members. Some of these facts are:

(a) The revenue derived by American Farm Lines from their government traffic for the slightly over two-month period in issue was $1,603,195.

(b) During the same approximate two-month period 72.3% of American Farm Lines' total revenue was from government traffic, 40.2% of its total tonnage was hauled for the government and 44.5% of its total trips during such time was also for the government.

(c) The original "back-to-back" injunction was issued by this Court on February 20, 1968, and the second injunction, necessary because of the method of operation adopted by defendants, was issued May 28, 1969. These orders have not discouraged defendants from their continued concentration on government hauling. For American Farm Lines' fiscal year October 1, 1966 through September 30, 1967, it did slightly over $1,400,000 worth of member business and nearly $1,300,000 worth of government business. For its fiscal year October 1, 1967 through July 31, 1968, (during the last five months of which it was under one or both of this Court's injunctions) its member business remained about the same at about $1,450,000, while its government business increased nearly three-fold to over $3,350,000. Also, on July 1, 1967, American Farm Lines had only 72 tractors and 77 trailers. By December 1, 1968, these had increased to 194 tractors and 279 trailers. Defendants' method of comparing their member and government traffic in terms of pounds carried is not valid because the factor of the length of the haul is not included. But even accepting these figures, the amount of American Farm Lines' government freight increased from 40 million pounds in 1967 to 108 million pounds in 1968, and the projection for 1969, based upon the first six months, will be 164 million pounds, if defendants are unrestricted in their operations.

(d) The per mile cost of transportation for American Farm Lines is approximately forty-five cents. A computation from a number of defendants' exhibits covering member hauls from the west coast show the per mile revenue from these to be in the neighborhood of only nineteen to twenty-six cents. The president of American Farm Lines did not know if the membership freight hauls from the west coast paid for themselves. It is obvious that defendants' growth and increase in gross revenue has not come from their member business.

(e) Although defendants admit that their biggest continuous problem in handling membership business is not having sufficient equipment to meet the needs

of their west coast members, American Farm Lines does dispatch government loads from the west coast. There are also many examples of American Farm Lines' equipment bypassing its California members with empty trailers, on its way to pick up government loads.

 The Court further finds that plaintiffs, or some one of them, would have made the hauls herein found to be in violation of the injunction had not the defendants done so and that the defendants realized and plaintiffs lost profits of $43,650.39 by reason of the wrongful and contemptuous acts aforesaid.

The reasonable fee for plaintiffs attorneys is found to be $30,000.00 and actual expenses incurred by these lawyers in connection with this proceeding are found to be $797.53.

## CONCLUSIONS OF LAW

Defendants, and each of them except Strohfield, are in contemptuous violation of the express and necessarily implied terms of this Court's order.

The nature of defendants' operations and the fact that the bulk of their revenues are derived from government transportation show that they are in the general trucking business for the United States Government beyond the limited exemptions allowed by law (49 U.S.C.A. § 303(b) (5); Northwest Agricultural Cooperative Association v. ICC, 9 Cir., 350 F.2d 252).

With respect to the "Long Layover" movements, the Court concludes that defendants were in contemptuous violation of its injunction because the government loads were not coordinated with a member's order for transportation and because in most instances after the delivery of the government freight, the vehicles in question were still 750 to 1,000 miles away from the member they were to serve. It was never the Court's intention to allow such diversions.

The "Sandwich Moves" are a subterfuge in an attempt to camouflage contemptuous hauling for the United States Government. The grain moves which defendants travel great distances to handle produced less than $150 per load— less than one-half their cost of transportation. There can be no rational economic justification for such conduct except to support prohibited government hauling. This is confirmed by the conduct of defendants in hauling government freight in an easterly direction from the west coast after delivery of the grain. (Hoffmann-La Roche, Inc. v. Schwegmann Bros. Giant Super Markets, D.C., 122 F.Supp. 781; Riss, et al. v. Murphy, et al., U.S.D.C.W.D.Okl. #68,222 and U.S. D.C.S.C.Iowa Civ. #8–2207–C–1).

All Government and nonmember freight moved by defendants from the west coast to and toward the Midwest and east during the time involved herein was done illegally and in direct and willful disobedience of the order of this Court because none of defendant's trips in such hauling were necessary to prevent an empty trailer movement.

The Court concludes that plaintiffs are entitled to damages as a result of the revenues diverted from them by defendants' contemptuous violations of the Court's injunction in the amounts equal to defendants' net revenues from each item of transportation shown in these findings in the total amount of $43,650.-39, and to their costs herein. (Leman v. Krentler-Arnold Hinge Last Co., 284 U. S. 448, 52 S.Ct. 238, 76 L.Ed. 389). The Court further concludes that these amounts accurately reflect the profit the plaintiff would have made from such carriage had defendants not diverted the revenues from plaintiffs. The Court further concludes that some of the plaintiffs would have transported all of said Government loads had not plaintiffs diverted them. Leman v. Krentler-Arnold Hinge Last Co., 284 U.S. 448, 52 S.Ct. 238, 76 L.Ed. 389; Sheldon v. MGM, 2 Cir., 106 F.2d 45.

Plaintiffs are entitled to an attorney fee in the amount of $30,000, plus expenses in the amount of $797.53, to be paid by defendants.

Counsel for plaintiffs will submit an appropriate judgment. It being the firm and considered opinion of this Court that the contemptuous acts herein found to have been committed were caused and brought about primarily by the defendant, Howard McCormack, it is directed that, if possible, he personally pay the sums above stated and which will be recited in the judgment; however, and since he was at all times acting as the manager of American Farm Lines the judgment will run against both jointly and severally. with the proviso that should plaintiffs be unable to satisfy the judgment as against McCormack resort may be had as against American Farm Lines for the whole or any remaining part. The judgment will further recite that American Farm Lines will, if it so requests, have judgment over as against McCormack for any part thereof that American Farm Lines be required to pay.