**INTERSTATE COMMERCE COMMISSION, Consolidated Copperstate Lines, Riss & Company, Texas Oklahoma Express, Inc., Tri-State Motor Transit Co., Yellow Freight System, Western Gillette, Inc., and intervening Plaintiff, Consolidated Freightways Corporation of Delaware, Plaintiffs,**

v.

**SOUTHWEST MARKETING ASSOCIATION and Jack R. Cobb, Defendants.**

**Civ. A. No. 4–1181.**

United States District Court,
N. D. Texas,
Fort Worth Division.
July 7, 1970.

Rawlings, Sayers & Scurlock, by Clayte Binion, Fort Worth, Tex., Wrape & Hernley, Memphis, Tenn., Harry Horak, Regional Counsel, I.C.C., Ft. Worth, Tex., for plaintiffs.

Lipscomb & Renfro, by Cue Lipscomb, Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

WILLIAM M. TAYLOR, Jr., District Judge.

The Interstate Commerce Commission, hereinafter referred to as the Commission, filed its complaint herein on November 21, 1968, seeking an injunction against the defendants by virtue of Title 49, Section 322(b) (1), U.S.Code, to permanently enjoin them from transporting property in interstate or foreign commerce by motor vehicle, for compensation, without appropriate authority from the Commission, and alleging that certain transportation performed by them was in violation of Title 49, Sections 303(c), 306(a) or 309(a), U.S. Code. A consent preliminary injunction was entered in that action, No. CA-4-1115, on February 7, 1969, restraining

Defendant Southwest Marketing Association, hereinafter referred to as "SMA", during the pendency of this action from transporting property, other than commodities exempt under Title 49, Section 303(b) (6), U.S.Code, on public highways, as a for-hire, common, or contract carrier by motor vehicle, for nonmembers, unless same is coordinated with the movement of membership shipments in the reverse direction on the same round trip by the same vehicles, and from transporting such property by claiming the "agricultural cooperative exemption" as set forth in Title 49, Section 303(b) (5), U.S.Code, for nonmembers, for compensation, the dollar volume of which equals or exceeds the dollar volume of transportation revenue derived from members. A permanent injunction, similar to the preliminary injunction, was entered on March 23, 1970, by consent, against SMA, Jack R. Cobb and Charles Colvin, defendants in said action.

On February 26, 1969, Consolidated Copperstate Lines and other motor carriers filed their bill of complaint in Civil Action No. 4–1181 against Southwest Marketing Association and Jack R. Cobb, such filing being pursuant to Title 49, Section 322(b) (2), U.S.Code, and seeking relief similar to that sought by the Commission. The Commission has intervened in the latter action. Answers and other pleadings have been filed and on May 28, 1969, the two actions were consolidated into one case and styled as Docket CA 4–1181. Trial was held and evidence adduced before this Court and an advisory jury pursuant to Rule 39(c) of the Federal Rules of Civil Procedure. On March 31, 1970, the advisory jury found (1) that SMA is a bona fide agricultural cooperative association; (2) that it has performed transportation services for nonmembers which are not incidental and necessary to its services for members; and (3) that such services did not deprive the motor carrier plaintiffs of revenue as a result of the transportation performed by SMA. The Commission has moved for judgment notwithstanding the advisory jury ver-

dict, particularly with respect to its finding No. (1). Motor carrier plaintiffs have filed a brief for findings and conclusions with respect to the advisory jury's findings Nos. (1) and (3). (Reply brief has been filed by defendants.)

The function of the advisory jury is to enlighten the trial court but the jury's verdict has no binding effect upon the court. (American) Lumbermens Mutual Casualty Co. v. Timms & Howard, Inc., CCA 2d, 108 F.2d 497. If the trial court does not accept the jury's advice, it may proceed to make its own independent findings of fact and conclusions of law, and its rejection of the advisory verdict is not subject to appellate review. Hargrove v. American Central Insurance Co., CCA 10th, 125 F.2d 225. The review on appeal is from the court's judgment as though no jury had been present. The responsibility for decision in the lower court is upon the trial judge. Mahon v. Bennett, W.D.Mo., 81 F.Supp. 901. Rule 52(a) of the Federal Rules of Civil Procedure provides that in "all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment." The Court, in reaching its findings and conclusions herein, has considered the pleadings, evidence, stipulations, arguments and briefs of counsel, and the verdicts of the advisory jury.

In addition to the matters contained in the permanent injunction entered herein on March 23, 1970, on behalf of the Commission, the latter contends that SMA is not a bona fide agricultural cooperative association and is, in fact, a sham which enables Cobb to perform the interstate transportation of nonexempt commodities without appropriate authority from the Commission. The motor carrier plaintiffs also make this contention.

The exemption provision of the Interstate Commerce Act accorded cooperative associations is found in Title 49,

Section 303(b), U.S.Code, which reads as follows:

Nothing in this chapter, except the provisions of section 304 relative to qualifications and maximum hours of service of employees and safety of operations or standards of equipment shall be construed to include * * * (5) motor vehicles controlled and operated by a cooperative association as defined in sections 1141–1141j of Title 12, as amended, or by a federation of such cooperative associations, if such federation possessed no greater powers or purposes than cooperative associations so defined * * *.

The cooperative association, in order to be eligible to perform for-hire transportation service in interstate commerce by motor vehicle under Title 49, Section 303(b) (5), U.S.Code, must meet the definition of such an association and comply with the provisions of Title 12, Sections 1141 to 1141j, known as the Agricultural Marketing Act and particularly with Section 1141j thereof, which provides:

(a) As used in this subchapter, the term 'cooperative association' means any association in which farmers act together in processing, preparing for market, handling, and/or marketing the farm products of persons so engaged, and *also means any association in which farmers act together* in purchasing, testing, grading, processing, distributing, and/or *furnishing* farm supplies and/or *farm business services*: provided, however, That such associations are operated for the mutual benefit of the members thereof as such producers or purchasers and conform to one or both of the following requirements:

First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein; and

Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

And in any case to the following:

Third. That the association shall not deal in farm products, farm supplies, and *farm business services* with or *for nonmembers* in an amount greater in value than the total amount of such business transacted by it with or for members. All business transacted by any cooperative association for or on behalf of the United States or any agency or instrumentality thereof shall be disregarded in determining the volume of member and nonmember business transacted by such association. (Emphasis added)

SMA does not deal in farm products or farm supplies. It performs transportation as a for-hire carrier by motor vehicle in interstate commerce. Transportation is a service. In order to be accorded this exemption, the cooperative association must control and operate the vehicles, must be an association of farmers operated for their mutual benefit as producers, such transportation must be a farm business service, and the association must meet the third requirement of said Section 1141j.

The facts in this case are similar to those outlined in Interstate Commerce Commission v. Iowa Cooperative Association, D.C., 236 F.Supp. 873. Later, this Court, in Agricultural Transportation Association of Texas v. United States and I.C.C., D.C., 274 F.Supp. 528, said:

" * * * Without the scope of 'producer marketing' and within the purview of 'other industries' are the *processors* of farm produced materials. This is evident from a reading of § 1141j(a) wherein Congress authorized the cooperative association, composed of producers, to *act together* in *processing* and *distributing* their produce, while the processing and distributing *industries* were excluded from the declaration of policy in § 1141. We hold, therefore, that a 'farmer' within the Agricultural Mar-

keting Act is a producer of agricultural commodities."

\* \* \* \* \* \*

"Nothing we have herein said is to be construed so as to prohibit *members* of a cooperative association from *organizing, managing* and *controlling* their own processing and distributing facilities. So long as such activities remain a *cooperative effort by the members* for their mutual benefit, the association is given specific statutory authority to undertake such a pursuit." § 1141j(a), 12 U.S.C.A. (Emphasis supplied)

Under the applicable statutes, the activities, in this case transportation, must remain a cooperative effort by the members. The evidence shows that this cooperative effort does not exist as far as the members of SMA are concerned. Cobb and others under his supervision solicit the members and it is evident that the purpose of such solicitation is to obtain traffic to keep Cobb's vehicles busy. He has filed tenders by SMA to the Government, soliciting the movement of Government traffic, primarily explosives. It should be further noted that although some individual farmers were members of SMA, no transportation was performed by SMA for them except possibly in one instance. The evidence shows that SMA does not own any vehicles. Almost all vehicles used by it are owned by Cobb or entities owned by him. SMA was originally organized by persons no longer associated with SMA except for Raymond Waters. It was originally headquartered at Sayer, Texas. It had transported only 30 to 40 shipments and then became dormant. Cobb had been associated with ATA until August 12, 1968. He had been leasing vehicles to ATA and began to look for another agricultural cooperative to utilize his vehicles. He located SMA which was dormant and indebted and had hauled only 38 shipments during its existence. SMA was located through Raymond Waters with whom Cobb had been associated in two other similar purported cooperatives which have been found by the Commission and this Court to have been operating unlawfully, namely, Agricultural Commodity Service, discussed by the Commission in 86 M.C.C. 5, and Agricultural Transportation Association of Texas, referred to *supra*. Cobb loaned $20,000.00 to SMA to pay off its indebtedness and a meeting of members was held in September, 1968, purportedly employing Cobb as general manager and electing five new directors, among whom were Clyde Welch, Don Reese, C. O. Bruce and Jack Stayden. Welch was made president of SMA. As president, he was unable to state whether SMA had satisfied the $20,000.00 note to Cobb or whether it had been renewed; that he does not know whether the $20,000.00 was actually paid into SMA by Cobb; that he thought the money was for operating expenses; that he did not know the nature of the obligations owed by SMA; that he did not know whether SMA was conducting any trucking operations in September, 1968; that SMA maintains a checking account at Union Bank and Trust Company and Cobb, Waters and Mrs. Billie Alexander, secretary, are authorized to sign checks; that he thought SMA owned the buildings; that he personally does not have any hauling business outside Texas; that he does not know whether SMA has any permits from the Texas Railroad Commission for intrastate transportation; that he did not know whether SMA leased vehicles from any entities owned or controlled by Cobb; that he supposes that SMA owns the personal property in the building and that he relies upon the advice and information of the SMA attorney and Cobb. The testimony of president Welch and of the other directors clearly shows that they have no familiarity with the business and transportation involved. As was said in the *Iowa Cooperative Association* case, *supra*, it appears that Cobb, in order to lend an agricultural air to the cooperative, induced these persons to act as members, directors and, in some cases, officers. They have left all matters of policy and detail to be determined by Cobb and rubber-stamped by them.

The fee of $250.00 paid to each of them for attending a meeting appears to be their paramount interest in SMA.

SMA has paid no patronage dividends. In fact, in the 18 months since reactivation by Cobb, it has lost over two million dollars. This loss bespeaks any possible benefit to the SMA members. Transportation revenues from shippers, whether they be members, nonmembers, or the U. S. Government, are paid to SMA. A large part of that revenue is funneled through SMA to Cobb or his entities by virtue of vehicle leasing, office subleasing and furniture subleasing plus a salary to him of $27,500.00 a year. The vehicle leasing revenue for the first year of operation exceeded one and one-half million dollars. The testimony of Raymond Waters shows that the net effect of his contact with Cobb was that the latter purchased SMA from its former members by paying off SMA's then existing obligation of $20,000.00. Director Reese testified that Cobb discussed SMA with him and that the matter of his membership was an attempt to revive SMA—to put new life into their new operation. This clearly indicates that Cobb hand-picked his slate of directors in September, 1968 and he himself testified that he named the nominees for director that were voted upon in the September, 1969 meeting.

The evidence further disclosed that when Cobb acquired the rights to SMA, its nonmembership revenue, through January, 1969, exceeded its membership revenue. This is contrary to the third requirement of the Agricultural Marketing Act and is another reason why SMA is not a bona fide agricultural cooperative association. It also further evidences the fact that Cobb's interest in SMA was to perform transportation which required operating authority from the Commission.

The evidence clearly indicates that Cobb was active in SMA affairs, particularly its revitalization, prior to his appointment as general manager by the board of directors on September 21, 1968. He prepared and filed, on September 15, 1968, a tender to the Government in the name of SMA to perform transportation. A revenue analysis for each month of transportation by SMA shows that the volume of traffic moved by SMA for the Government increased rapidly and in August, 1969, reached the figure of $816,200.75. Membership revenue for that month was $500,000.00 less. This is another indication of the proposition that the prime concern is to provide traffic for Cobb's vehicles rather than to provide a transportation service for the members. The purpose of the operation of a true agricultural cooperative is to provide mutual benefits to the members thereof as agricultural producers. The inescapable conclusion here is that this is not so and that Cobb is the entrepreneur who carries on this business for his primary benefit rather than for the benefit of the producer-members. This is clearly established by the two million dollar loss suffered by SMA. Peculiarly, there was no testimony by the defendants that Cobb, individually, has suffered any loss, but to the contrary, that Cobb is grossing approximately $1,500,000.00 per year as a result of SMA's activities. Under these circumstances, the evidence clearly preponderates a finding that SMA is not substantially controlled by its members and therefore is not a bona fide agricultural cooperative.

The advisory jury found that SMA has engaged in transportation services for nonmembers which are not necessary and incidental to the services it performs for members. The Court is in agreement with this finding.

The first is the "back-to-back" movement which was outlawed in I.C.C. v. Milk Producers Marketing Co., 405 F.2d 639 (10 Cir. 1969), where the Court said:

"Here we have back-to-back hauling of general commodities for nonmembers throughout the United States by motor vehicles on a for-hire basis. Such activities are not incidental to [the business of the cooperative]. The only claim of necessity is that the profitable interstate truck operations

are needed to sustain the money-losing primary activities of the cooperative. In our opinion this is not enough. A cooperative cannot enter the interstate trucking business without a certificate from the Commission for the reason that its primary activities are unprofitable." 405 F.2d at 641–642.

In the next place, there is evidence of a number of "long layover" movements; for example, SMA's regular government munitions haul from Crane, Indiana or East St. Louis, Illinois to Bangor, Washington, followed by deadhead hauls to Modesto, California, 840 miles away, or to Moorpark, California, 1,145 miles away. Finding no member business at these points, the testimony shows that SMA trucks travel to nearby points where member loads are picked up for transportation east. One of SMA's drivers, Arthur Whisenhunt, after carrying government munitions from Crane, Indiana to Bangor, Washington, traveled deadhead to Modesto, California, where he remained off-duty for four days before moving on to Salinas, California, to pick up a load of member business for transportation back east. See Munitions Carriers Conference, Inc. v. American Farm Lines, 303 F.Supp. 1078 (W.D. Okla.1969).

This last cited case also condemns "sandwich" movements in which SMA has also engaged. SMA's driver, Marvin Townsend, carried government munitions from East St. Louis, Illinois, to Bangor, Washington, then deadheaded to Vancouver, Washington, 180 miles, picked up a member load which he moved to Richmond, California, 661 miles, then deadheaded 40 miles to Mare Island, California, where he picked up a load of government freight which he brought to Fort Worth, 1756 miles. In Munitions Carriers Conf. v. American Farm Lines, *supra*, the Court was impressed by the fact that the outgoing and incoming government movements were profitable while the intermediate member movement was unprofitable. The Court concluded that there was no rational economic justification for the intermediate member haul

"except to support prohibited government hauling."

The foregoing are but examples of several illegal movements, which show 29 back-to-back movements, 5 long layover movements, and 1 sandwich movement, which come from a random sample of six drivers in the month of July, 1969.

By Public Law 90–433, Section 1, 82 Stat. 448, passed July 26, 1968, Congress amended Section 303(b) of Title 49, and from part of this amendment Congressional intent in regard to agricultural cooperative associations becomes apparent. This statute provides, in part, as follows:

" * * * or (5) motor vehicles controlled and operated by a cooperative association as defined in the Agricultural Marketing Act, approved June 15, 1929, as amended, or by a federation of such cooperative associations, if such federation possesses no greater powers or purposes than cooperative associations so defined, but any interstate transportation performed by such a cooperative association or federation of cooperative associations for nonmembers who are neither farmers, cooperative associations, nor federations thereof for compensation, except transportation otherwise exempt under this chapter, shall be limited to that which is incidental to its primary transportation operation and necessary for its effective performance *and shall in no event exceed 15 per centum of its total interstate transportation services in any fiscal year, measured in terms of tonnage*: Provided, That, for the purposes hereof, *notwithstanding any other provision of law, transportation performed for or on behalf of the United States or any agency or instrumentality thereof shall be deemed to be transportation performed for a nonmember*: Provided further, That any such cooperative association or federation which performs interstate transportation for nonmembers who are neither farmers, cooperative associations, nor federations thereof, except

transportation otherwise exempt under this chapter, shall notify the Commission of its intent to perform such transportation prior to the commencement thereof: And Provided further, That in no event shall any such cooperative association or federation which is required hereunder to give notice to the Commission transport interstate for compensation in any fiscal year of such association or federation a quantity of property for nonmembers which, measured in terms of tonnage, exceeds the total quantity of property transported interstate for itself and its members in such fiscal year; * * *" (Emphasis added)

SMA has consistently hauled nonmember business tonnage in excess of 15% of its total interstate tonnage. Defendants' exhibit No. 15 shows that SMA's nonmember tonnage was 30.01% of its total tonnage from July, 1969, through January, 1970. During the same period its nonmember revenue was 59.72% of its total revenue (calculation based on figures taken from Plaintiffs' exhibit No. 20). Thus we see that the percentage of its member tonnage is about half the percentage of its nonmember revenue. Thus we may reason that its nonmember tonnage in 1968 was about 20% of total tonnage, 32% in 1969, and 18% in 1970 (through February).

Defendant argues that its obvious violation of the 15% requirement should not be held against it because the I.C.C. did not implement that requirement with regulations until July 7, 1969. This is similar to a claim which was made and rejected in S.E.C. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1946). There the S.E.C. rejected a plan for reorganizing a public holding company, basing its decision on certain judicial opinions. The case was appealed to the Supreme Court which held that the opinions relied on did not support the Commission. Noting that the Commission had not promulgated any general rule proscribing the action in question, it remanded the cause for further consideration. Then the Commission reviewed its decision in light of the Public Holding Company Act and arrived at its previous conclusion. The holding company then appealed, claiming that the absence of a general rule or regulation prohibited the rejection of its plan. This time the Supreme Court affirmed with the following remarks:

"The absence of a general rule or regulation governing management trading during reorganization did not affect the Commission's duties in relation to the particular proposal before it. The Commission was asked to grant or deny effectiveness to a proposed amendment to Federal's reorganization plan whereby the management would be accorded parity treatment on its holdings. It could do that only in the form of an order, entered after a due consideration of the particular facts in light of the relevant and proper standards. That was true regardless of whether those standards previously had been spelled out in a general rule or regulation. Indeed, if the Commission rightly felt that the proposed amendment was inconsistent with those standards, an order giving effect to the amendment merely because there was no general rule or regulation covering the matter would be unjustified." 332 U.S. at 201, 67 S.Ct. at 1579–1580.

This makes it clear that a statute which does not specifically require implementation through regulation is effective even though there are no regulations. Hence SMA has been in violation of the 15% requirement ever since September 21, 1968, when Cobb took control.

It further appears that SMA's activities constituted a clear and patent violation of 49 U.S.C.A. §§ 303(c) and 306, which prohibit for-hire transportation by motor vehicle in interstate or foreign commerce unless there is in force with respect to such person a certificate or

permit issued by the Commission authorizing such transportation, and further prohibit a motor vehicle common carrier from engaging in interstate or foreign operations unless there is in force with respect to such carrier a certificate of public convenience and necessity issued by the Commission. If SMA's transportation is not exempt under Section 303 (b) (5), then such transportation constitutes a clear and patent violation of Sections 303(c) and 306. Munitions Carriers Conf. v. American Farm Lines, *supra.*

The Court is also in disagreement with the jury's finding that the motor carrier plaintiffs have not been injured by SMA's illegal operations. Section 322 (b) (2).

The evidence shows that SMA, Riss International Co., and Yellow Freight System earned the following amounts from transporting munitions in 1968 and 1969:

|      | SMA | Riss Int. Co. | Yellow Frt. Sys. |
|------|------|---------------|------------------|
| 1968 | $ 276,540 | $5,580,553 | $4,894,767 |
| 1969 | 5,507,501 | 2,846,207 | 2,422,457 |

In other words, when SMA began getting government business, Riss and Yellow Freight lost about half of theirs. This is not explained a reduction in freight rates, for Yellow Freight handled 6,699 shipments in 1968 but only 4,025 in 1969, and Riss's shipments out of McAlester, Oklahoma, dropped from 553 in 1968 to 105 in 1969.

Perhaps the most revealing evidence of all comes from Tri-State Motor Transit Co. It prepared a revenue study for each week from November 1, 1969 through January 31, 1970. During this period from December 7 through December 1969, SMA was off the government's approved list because of certain safety violations. During this period Tri-State's explosive revenue was dramatically up (3 of the 4 best weeks came in this period), and when SMA returned, Tri-State's weekly revenue dipped drastically (from $418,709 to $238,716).

These figures do no more than confirm an obvious fact which Cobb· admitted: that the entry of an additional carrier into the field dilutes the traffic of existing carriers. Injury necessarily follows from this fact alone. As stated in Missouri Pacific Truck Lines, Inc. v. Brown Express, Inc., 399 S.W.2d 430 (Tex.Civ.App.1966 writ ref'd n. r. e.):

"On the issue of whether plaintiffs have discharged the burden, applicable to relief by way of injunction, of showing irreparable injury should such relief be denied it is sufficient to note that injury to their business would be a necessary consequence of unlawful competition by the defendant, and that such injury is of necessity one which could not be ascertained with certainty." 399 S.W.2d at 432.

■ The Court concludes and finds that SMA is not a bona fide agricultural cooperative association as defined in the Agricultural Marketing Act. Therefore, it is not entitled to the benefits of the exemption accorded bona fide cooperatives or federations thereof, as provided in Title 49, Section 303(b) (5) U.S.Code. The Court also concludes and finds that, as found by the jury, SMA has engaged in transportation services for nonmembers which are not necessary and incidental to the services it performs for members; that SMA has consistently hauled nonmember tonnage in excess of 15% of its total interstate tonnage; that SMA's activities clearly constitute a clear and patent violation of the I.C.C. Act; and that common carrier plaintiffs (contrary to the jury's findings) have been injured. Accordingly, the Court concludes, as a matter of law, that the transportation of nonexempt commodities by SMA for members, nonmembers, or the Government, in interstate or foreign commerce, by motor vehicle, for compensation, without appropriate authority from the Commission, is in violation of Title 49, Sections 303(c), 306

(a), and 309(a), U.S.Code, and that an injunction should be issued against both SMA and Cobb as prayed. With respect to the action instituted by the Commission, there is insufficient evidence as to the participation by Charles R. Colvin in the unlawful transportation and no injunction will be issued as to him. The Court finally concludes that the acts and operations of SMA and Jack R. Cobb are subject to be enjoined by this Court under the express provisions of Title 49, Section 322(b), U.S.Code.

## JUDGMENT

It is ordered, adjudged and decreed that the Defendants Southwest Marketing Association and Jack R. Cobb, by and through Southwest Marketing Association or any other purported agricultural cooperative association, and each of them, their servants, representatives and employees in active concert or participation with them, be, and they are hereby, permanently enjoined and restrained from, in any manner or by any device, directly or indirectly, transporting property or participating in the transportation of property other than commodities exempt under Title 49, Section 303(b) (6), U.S. Code, in interstate or foreign commerce by motor vehicle, for compensation, on public highways, as for-hire, common or contract carriers by motor vehicle, for members, nonmembers, and the United States Government, unless and until such time, if at all, as there is in force with respect to said Defendants a certificate of public convenience and necessity, permit, or any other form of authority issued by the Interstate Commerce Commission authorizing such transportation.

It is further ordered, adjudged and decreed that the action as to Defendant Charles R. Colvin be, and the same is, hereby dismissed.

And it is further ordered, adjudged and decreed that the Defendants Southwest Marketing Association and Jack R. Cobb pay the costs of this action.