**ARKANSAS GRAIN CORPORATION, Plaintiff,**

**and**

**Aluminum Company of America and Reynolds Metals Company, Intervening Plaintiffs,**

**v.**

**UNITED STATES of America, Interstate Commerce Commission, and Arkansas Commerce Commission, Defendants,**

**and**

**Chicago, Rock Island and Pacific Railroad Company et al., Intervening Defendants.**

**Civ. A. No. PB–65–C–52.**

United States District Court
E. D. Arkansas,
Pine Bluff Division.

Dec. 1, 1966.

---

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Arthur R. Macom, Stuttgart, Ark., for plaintiffs.

Harry E. Meek, Leon B. Catlett, Little Rock, Ark., Dickson R. Loos, Washington, D. C., for intervening plaintiffs.

Donald F. Turner, Asst. Atty. Gen., Claude Carpenter, Little Rock, Ark., John H. D. Wigger, Dept. of Justice, Washington, D. C., James Gallman, Asst. U. S. Atty., Little Rock, Ark., Robert W. Ginnane, Gen. Counsel, Thomas H. Ploss, Interstate Commerce Commission, Washington, D. C., for defendants.

John T. Williams, Little Rock, Ark., James I. Collier, Jr., Washington, D. C., William E. Davis, Kansas City, Mo., Don McDevitt, Chicago, Ill., John E. McCullough, Robert H. Stahlheber, St. Louis, Mo., Harry B. LaTourette, Tyler, Tex., for intervening defendants.

Before MATTHES, Circuit Judge, HENLEY, Chief Judge, and GORDON E. YOUNG, District Judge.

## MEMORANDUM OPINION

GORDON E. YOUNG, District Judge.

*Statement of the Case.*

This action was brought by the Arkansas Grain Corporation under §§ 1336, 1398, 2284, and 2321–2325 of the United States Code, Title 28, seeking to set aside a decision of the Interstate Commerce Commission (Division 2) entered on September 20, 1965 in Arkansas Intrastate Freight Rates and Charges, 326 ICC 19. A three-judge court was constituted as required by statute. The Aluminum Company of America (hereinafter called "Alcoa") and Reynolds Metals Company (hereinafter called "Reynolds") intervened as plaintiffs in the action.

In the decision appealed from, the Commission required the railroads operating in the State of Arkansas to increase intrastate freight rates and charges to the same extent it had previously authorized them to increase interstate freight rates and charges in nationwide revenue proceedings. Acting pursuant to § 13(4) of the Interstate Commerce Act, 49 U.S.C. § 13(4), the Commission sought to require the intrastate rates and charges to contribute their "fair share" of the railroad system revenue needs based upon its finding that such rates and charges imposed an undue burden and unjust discrimination on interstate commerce.

The effect of the decision appealed from was to overrule the Arkansas Commerce Commission's orders whereby the Arkansas Commission had permanently suspended certain increased freight rates and charges which had been published by the carriers applicable on intrastate traffic.

*Contentions of the Plaintiffs.*

All the plaintiffs charge that there is no substantial evidence to support the Commission's finding that intrastate freight rates and charges in Arkansas are unduly low and discriminate against interstate commerce or that conditions incident to intrastate transportation are not more favorable than those incident to interstate transportation of property.

Arkansas Grain further contends that the decision of the Commission is null and void insofar as it applies to soybeans and soybean meal. Alcoa and Reynolds also contend that the decision is void as it relates to fluxing stone.

Thus, the plaintiffs attack the decision of the Commission in its entirety and also as it affects rates on fluxing stone, soybeans and soybean meal.

*Standing to Sue.*

Exceptions to the Examiner's recommended report and order (approving the proposed rate increases) were filed with the Commission by three protestants, namely: Reynolds, Alcoa, and Minnesota Mining and Manufacturing Company (the latter not being a party to this action). Arkansas Grain had attacked the proposed increases on soybeans during the hearings before the Examiner; but after the filing of his report with the Commission, which recommended an increase in soybean rates, Arkansas Grain filed no exceptions or other pleadings with the Commission.

In their brief the United States and the Interstate Commerce Commission

challenge the standing of Arkansas Grain as a plaintiff in this action, citing United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54 (1952). In that case the Supreme Court said, at pp. 36 and 37, at pp. 68–69 of 73 S.Ct., of the opinion:

"We have recognized in more than a few decisions, (footnote omitted) and Congress has recognized in more than a few statutes, (footnote omitted) that orderly procedure and good administration require that objections to the proceedings of an administrative agency be made while it has opportunity for correction in order to raise issues reviewable by the courts. * * * Simple fairness to those who are engaged in the tasks of administration, and to litigants, requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice."

As stated in the joint brief of the United States and the Interstate Commerce Commission, the Supreme Court has held that each ground for setting aside an agency order that is appealed before a reviewing court must have first been argued to the administrative agency. Unemployment Compensation Commission of Territory of Alaska v. Aragon, 329 U.S. 143, 155, 67 S.Ct. 245, 91 L.Ed. 136 (1946). By failure to seasonably object to the Examiner's report to the Commission, the Commission was deprived "of an opportunity to consider the matter, make its ruling, and state the reasons for its action." Ibid. p. 155, 67 S.Ct. p. 251.

█ Inasmuch as Arkansas Grain filed no exceptions to the Examiner's Report nor otherwise objected in any manner to the Commission as to the recommendations of the Examiner, it may not now be heard to complain.

*Standard of Proof Required to Support the Commission's Findings.*

Plaintiffs contend that the proof must meet a higher standard in order to support findings which result in an order under § 13(4) whereby the Federal Commission enters into the field of intrastate commerce, which is a matter within the primary jurisdiction of the state regulatory commission. They say that support for such a finding must meet a "high standard of certainty," Public Service Commission v. United States, 356 U.S. 421, 78 S.Ct. 796, 2 L.Ed.2d 886; that justification for the exercise of this exceptional federal power must be "made definitely and fairly apparent," Chicago M. St. P. & P. R. Co. v. State of Illinois, 355 U.S. 300, 306, 78 S.Ct. 304, 2 L.Ed.2d 292; that scrupulous regard for maintaining the power of the state in this field requires that Interstate Commerce Commission orders must "meet a high standard of certainty," State of North Carolina v. United States, 325 U.S. 507, 65 S.Ct. 1260, 89 L.Ed. 1760; and that "justification of the exercise of federal power must clearly appear", State of Florida v. United States, 282 U.S. 194, 211–212, 51 S.Ct. 119, 124, 75 L.Ed. 291.

In Chicago M. St. P. & P. R. Co. v. State of Illinois, supra, the Supreme Court said:

"The occasion for the exercise of the federal power asserted by § 13(4) is the necessity for effecting the required contribution by intrastate traffic of its proportionate share of the revenues necessary to pay a carrier's operating costs and to yield a fair return. When intrastate revenues fall short of producing their fair proportionate share of required total revenues, they work an undue discrimination against interstate commerce, and the ICC may remove the discrimination by fixing intrastate rates high enough reasonably to protect interstate commerce. In determining whether an undue revenue discrimination against interstate commerce is caused by intrastate rates, the ICC may consider 'among other things, the need, in the public interest, of adequate and efficient railway transportation service and the need of revenues sufficient

to sustain such service,' a standard written into 49 USC § 15a(2). No formal requirements are prescribed for the findings to be made by the ICC under § 13(4). Reasonable determinations suffice. But the justification for the exercise of this exceptional federal power to interfere with intrastate rates must be made definitely and clearly apparent." (Citations omitted)

■ While the occasion for the exercise of the federal power asserted by § 13(4) must be made definitely and clearly apparent, we are convinced that the ordinary substantial evidence rule applies, as this court said earlier in Arkansas Public Service Commission v. United States, D.C., 147 F.Supp. 454, 466 (1956). Such an order by the Commission must be supported by "clear findings supported by substantial evidence."

*Scope of Review.*

■ "Substantial evidence" refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consolidated Edison Co. v. National Labor Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). "The question of the weight of the evidence is for the Commission and not for the Court," and "it is not the province of the courts to substitute their judgment for that of the Commission, and when the Commission's findings of fact are supported by substantial evidence they are not subject to review." State of Florida v. United States, supra.

*The Findings Made by the Commission.*

Plaintiffs concede that the necessary findings were made by the Commission. They say, "The issue here is that the findings are not supported by substantial evidence." Their precise contentions as expressed in their brief are as follows:

"Basically the Commission and the Examiner decided that the failure of the Arkansas Commerce Commission to permit application of the ex parte 212 and ex parte 223 increases to intra-

state commerce caused an undue burden on and an unjust discrimination against, interstate commerce. In arriving at the decision the Commission found the following facts, which are essential to its decision, but which are not supported by substantial evidence.

"1). Conditions incident to intrastate commerce were no more favorable than those incident to interstate commerce (Finding 1).

"2). Intrastate rates are unduly low (Finding 3).

"3). Arkansas intrastate rates failed to contribute their fair share of revenues required by the carriers (Finding 3).

"4). The burden against interstate commerce is undue and the lower intrastate rates cause undue, unreasonable and unjust discrimination against interstate commerce (Finding 3).

"The Commission also found that the increased rates will be just and reasonable (Finding 5). This finding is contrary to the evidence in so far as it involves soybeans, soybean meal and fluxing stone in that the evidence shows that intrastate rates on those commodities are already on a higher level than interstate rates."

*The Evidence.*

Evidence was offered before the Examiner tending to show the following:

During the period of advancing prices after World War II the nation's railroads obtained several general increases in interstate rates to meet their need for additional revenue caused by increased operating costs. The first of these increases became effective in 1946. The latest was in 1960, considered by the Commission in ex parte 223. In a period of approximately three and one-half years, between 1956 and 1960, the railroads had ten separate wage increases totaling 48.5 cents per hour. Wages account for approximately 60% of total expenses. This case involves the efforts of the railroads operating in the State of Arkansas to in-

crease the rates and charges on commodities moving in intrastate commerce in Arkansas corresponding to those authorized by the Interstate Commerce Commission on interstate traffic in ex parte 212 and ex parte 223. The failure to apply these increases to intrastate commerce in Arkansas has deprived the railroads of approximately $1,100,000 in annual revenue.

Costs to the Arkansas railroads have increased at a greater pace than have the increases in freight revenues. During the four-year period of 1957 to 1960 the rate of return earned by the Arkansas railroads was 3.37%.

Increases in the costs of materials and supplies added approximately $1,200,000 to the costs of operation of Missouri-Pacific for the years between 1956 and 1960.

Interstate and intrastate traffic is normally handled in the same trains. The railroad employees in Arkansas received the same increases in wages as system employees.

Since intrastate traffic originates and terminates within the State, the average haul on such traffic is relatively low in comparison with interstate traffic. A higher percentage of handling of intrastate traffic is by local freight trains. Under the wage schedules, train crews of local freight trains receive a higher scale of wages than do those in through freight service.

Railroad operating costs within the State of Arkansas are increased by twenty percent over normal requirements systemwide because of the Arkansas "full-crew law" which requires railroads in Arkansas to employ a third switchman and a third trainman under certain conditions.

■ We conclude, therefore, that there was substantial evidence to support the Commission's determination that conditions incident to intrastate commerce were no more favorable than those incident to interstate commerce.

We now turn to Finding No. 3 to the effect that intrastate rates are unduly low; that such rates fail to contribute their fair share of revenues required by the carriers; and that the burden against interstate commerce is undue and the lower intrastate rates cause undue, unreasonable and unjust discrimination against interstate commerce.

The systemwide increases found to be just and reasonable in ex parte Nos. 212 and 223 were based on the needs of the railroads including those in Arkansas for additional revenue to meet increased operating expenses. These expenses, of course, are incurred on both interstate and intrastate traffic.

The record here contains detailed comparisons of Arkansas intrastate rates with interstate rates to and from Arkansas on the same commodities.

■ The Commission is not required in a general revenue increase proceeding, of which the present order is an incident, to consider the reasonableness or comparability of rates on individual commodities. The purpose of the order involved here is to eliminate the alleged discrimination against interstate commerce by increasing the intrastate rates to the level of the interstate ones.

The Supreme Court said in King v. United States, 344 U.S. 254, 275, 73 S.Ct. 259, 270, 97 L.Ed. 301:

"It is not necessary, for general revenue purposes, to establish for each item in each freight rate a fully developed rate case.

" '[T]he administrative arm of the Commission [would be] paralyzed, if instead of adjudicating upon the rates in a large territory on evidence deemed typical of the whole rate structure, it were obliged to consider the reasonableness of each individual rate before carrying into effect the necessary increased schedule.' "

As this court said in Arkansas Public Service Commission v. United States, supra:

"Here the Commission has applied to the Arkansas intrastate rates the same conclusions it reached, in Ex Parte Nos. 166, 168 and 175, as to the need of the rail carriers for increased rev-

enue on a national basis and has distributed the burden within Arkansas on the same lines it followed when estimating the revenues available in the southwestern territory from intrastate as well as interstate operations, as was done in Florida and approved by the Supreme Court in the King case, 344 U.S. at page [254] 272, 73 S.Ct. at page [259] 269, and here, as in that case, 'The evidence which forms the basis of the Commission's nationwide order becomes the natural basis for its [Arkansas] order.' "

The situation here is much like that discussed in Illinois Commerce Commission v. United States, 292 U.S. 474, pp. 483, 484, 54 S.Ct. 783, p. 787, 78 L.Ed. 1371, where the Court said:

"The decision in the first proceeding, that the increase in the interstate rate was reasonable, was made in the hope that the state commissions would bring intrastate rates into harmony. When they failed to do so, the Commission reaffirmed its finding that the new interstate rates were reasonable and found that the intrastate rates must be raised in order that the intrastate traffic may bear its fair share of the revenue burden. It is plain from the nature of the inquiry that the rate level, to which both classes of traffic were raised, was found reasonable on the basis of the traffic as a whole. Where the conditions under which interstate and intrastate traffic move are found to be substantially the same with respect to all factors bearing on the reasonableness of the rate, and the two classes are shown to be intimately bound together, there is no occasion to deal with the reasonableness of the interstate rates more specifically, or to separate intrastate and interstate costs and revenues."

■ In view of the history of these general rate increases applicable system-wide, or at least thought to be by the Commission when they were approved, we have no doubt but that the Commission's finding that the Arkansas rates were unduly low, did not contribute their fair share to the carrier's revenues, and caused undue discrimination and burden on interstate commerce is amply supported in the record.

*Specific Commodity Rates.*

The plaintiffs Alcoa and Reynolds not only attack the findings and order on an overall basis, but in particular attack the Commission's findings insofar as they relate to fluxing limestone.

This commodity is taken from quarries located in Myersville, Arkansas, which are owned by Alcoa and a subsidiary of Reynolds. It is processed through a crushing plant before being hauled by Missouri Pacific Railroad Company about 150 miles to the plants of Alcoa and Reynolds at Bauxite, Arkansas. The stone is used in the process of manufacturing aluminum. All of the traffic is handled on the Missouri Pacific. The present rate is $1.38 per net ton. The revenue derived is nearly $1,000,000 annually, and accounts for about 25% of the total intrastate revenue of the Missouri Pacific in Arkansas. The increase sought would amount to twenty cents per ton, which would result in added costs to the plaintiffs Reynolds and Alcoa of something in excess of $100,000 annually. Much of the testimony before the Examiner dealt with this commodity. The Commission's opinion devotes more than seven pages to a discussion of this aspect of the case.

Fluxing stone for the aluminum industries moved under the crushed stone rate prior to the establishment of a separate commodity rate. It is conceded by plaintiffs that the Arkansas rail rate on fluxing stone involved here is lower than the crushed stone rate; but, plaintiffs say, fluxing stone and crushed stone are different commodities. The Commission found that the $1.38 figure per ton was below even the out-of-pocket costs of handling the traffic. Thorough and expert analyses of detailed cost studies were submitted to the Commission by

both the aluminum companies and the railroad. The witness Livingston's testimony was devoted entirely to the fluxing stone commodity. He testified that this commodity is merely crushed limestone, which prior to 1956 had always moved on the higher crushed stone basis; that the reclassification of this commodity during pendency of a previous Thirteenth Section proceeding had the result of reducing the previously applicable rates; that the rates had been depressed even before such reduction; that by reason of the reclassification of the fluxing stone the rates enjoyed by the aluminum companies are far below other limestone rates in Arkansas, and even further below those applicable on interstate shipments of crushed limestone to and from Arkansas. According to Livingston, the rate now sought by the railroads of $1.58 is only a few cents higher than the depression level applicable in 1938.

Another exhibit was offered to show the comparison between the Arkansas rate of $1.38 with interstate rates for like distances between $2.25 and $2.54. A detailed cost study submitted by another witness for the railroads showed the out-of-pocket costs of performing the freight haul of this commodity to be approximately $1.60 per ton, with additional costs of approximately $1.00 if general costs were included.

The plaintiff aluminum companies offered evidence concerning an intrastate rate in Texas on crushed limestone used in the manufacture of iron or steel and a rate published by Missouri Pacific applicable to limestone from Prairie du Rocher, Illinois, to Baton Rouge, Louisiana.

The Interstate Commerce Commission considered the Texas intrastate rates in its opinion in Texas Intrastate Freight Rates and Charges, 308 ICC 261. The evidence in that case primarily concerned sand, gravel, crushed stone, and related commodities. The Commission found that the railroads' tonnage was declining under the existing rates and that an increase in the Texas intrastate rates would accelerate the diversion to other modes of transportation which would result in a net revenue loss to the railroads. The Commission said in its opinion in this case, "There is no such evidence in connection with the instant proceeding. The Texas case did not approve the depressed rate levels."

The Examiner noted that the lower Prairie du Rocher rate, which it had found lawful in Limestone, Prairie du Rocher, Ill. to Baton Rouge, La. 313 ICC 71, was a depressed rate established to meet threatened private barge competition, a factor not present in the instant proceeding. However, the Commission did not sustain the fluxing stone rate in this case on that ground. It is at least inferable that the Commission was prepared to hold that since the intrastate rate on fluxing stone was higher than the interstate rate on Prairie du Rocher limestone it did not unjustly discriminate against interstate commerce provided the commodity in Prairie du Rocher was one with which fluxing stone could appropriately be compared. The Commission went on to determine whether comparison of fluxing stone with the commodity in Prairie du Rocher was appropriate. In concluding that comparison was not appropriate the Commission said in part:

"* * * The commodity description determines the applicable rate, and as indicated by the protestants herein, the considered fluxing limestone description distinguishes that commodity from other crushed limestone. The commodity considered in the *Prairie du Rocher* case can not be transported under the intrastate description considered herein, which is restricted to limestone used for fluxing purposes in the production of alumina; further, there is no showing that the two types of crushed limestone could be used interchangeably, or that they compete with one another in any way. In these circumstances, we conclude that the Prairie du Rocher rate is not an appropriate measure of the maximum level of Arkansas intrastate rates on fluxing stone."

■■ The issues of comparability of commodities and of the validity to be given to the cost data submitted by the contending parties are matters peculiarly within the competence of the Commission. With due deference to the judgment of the Commission regarding these debatable issues, we hold that the clear findings of the Commission with respect to fluxing stone are supported by substantial evidence.

*Products of Agriculture, Products of the Forest, and Other Products of Mines.*

The Government says that none of the plaintiffs have any standing to question the proposed rates on products of agriculture and forests because: (1) none of the parties excepted to the report of the Hearing Examiner and his recommended order before the Commission; and (2) as to products of agriculture and the forest, the plaintiffs Alcoa and Reynolds do not ship or receive such products and thus are not affected in fact; therefore, having no legally protected interest, they may not sue to set aside such rate. Those plaintiffs do not seem to seriously dispute those principles, but say in their brief that the purpose of the discussion of such commodities (which constitute a substantial portion of the traffic within the State of Arkansas) is that they have an important bearing on whether the evidence establishes that the level of rates in Arkansas is unduly low.

■ We think that these other rates need little discussion. As we have stated above, this is a general revenue case and it is not necessary to offer proof on each item in each freight tariff as might be necessary in an ordinary rate case. Suffice it to say we have examined the record and find that there was evidence produced before the Examiner from which the Commission could reasonably conclude that those intrastate rates were lower than comparable interstate commerce rates and that they discriminate against interstate commerce.

Counsel for defendants will prepare and submit an appropriate order and decree.