**BRAY LINES, INC., et al., Plaintiffs, and The Atchison, Topeka and Santa Fe Railway Company, et al., Intervening Plaintiffs,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants, and American Farm Lines, Intervening Defendant.**

**No. Civ. 72–284.**

United States District Court,
W. D Oklahoma.

Jan. 29, 1973.

Marion F. Jones, Denver, Colo., Robert E. Joyner, Memphis, Tenn., John R. Sims and Harold Hernly, Arlington, Va., Eugene T. Liipfert, John S. Fessenden, William O. Turney, Peter T. Beardsley, Brenda P. Murray, Nelson J. Cooney, Paul Sullivan, J. G. Dail, Jr., and John R. Bagileo, Washington, D. C., Alan Foss, Fargo, N. D., Phillip Robinson, Austin, Tex., and Max G. Morgan, Oklahoma City, Okl., for plaintiffs.

Harold Dodson, Oklahoma City, Okl., and Ed White, Chicago, Ill., for intervening plaintiffs.

Thomas E. Kauper, Asst. Atty. Gen., Joel Davidow, Dept. of Justice, Anti-Trust Div., Washington, D. C., William R. Burkett, U. S. Atty., W. D. Oklahoma, for the United States.

Fritz R. Kahn and Hanford O'Hara, Washington, D. C., for Interstate Commerce Commission.

Joseph A. Califano, Jr., Thomas E. Patton and Harry Ross, Washington, D. C., William L. Peterson, Oklahoma City, Okl., for intervening defendant.

Before HOLLOWAY, Circuit Judge, and DAUGHERTY and EUBANKS, District Judges.

**1242** ▮▮▮▮▮▮▮▮▮▮▮

### MEMORANDUM OPINION

EUBANKS, District Judge.

This is an action brought to permanently suspend, enjoin, annul and set aside a report and order of the Interstate Commerce Commission, certificating the Intervening Defendant, American Farm Lines, as a common carrier, thereby authorizing it to transport Class A and B explosives and also general commodities, except commodities in bulk and household goods, moving between points in nine midwestern states and four western states, when moving on Government bills of lading.

The specific questions presented herein are as follows:

▮▮ 1. Whether an agricultural cooperative association performing exempt motor transportation pursuant to section 203(b)(5) of the Interstate Commerce Act, [49 U.S.C. § 303(b)(5)], is precluded from obtaining motor common carrier authority?

▮▮ 2. Whether the for-hire transportation of an agricultural cooperative association is limited to the fifteen percent requirement of section 203(b)(5) of the Interstate Commerce Act, regardless of whether performed under exemption or under certification?

▮▮ 3. Whether the certification of an agricultural cooperative association to perform for-hire transportation in addition to its member farm-related transportation would be contrary to the public interest and antithetical to the national transportation policy?

▮▮▮ 4. Whether the finding of the Commission that public convenience and necessity require the transportation service sought to be provided by American Farm Lines is supported by substantial evidence on the record and whether the Commission's report discloses that basis?

▮▮ 5. Whether, in consideration of its past for-hire operations, American Farm Lines has properly been found fit to be the recipient of a motor common carrier certificate?

For reasons that will be detailed below, we have concluded that numbered questions one through three, inclusive, should be answered in the negative, while questions four and five should be answered in the affirmative.

The question of whether or not an agricultural cooperative association may be licensed as a common carrier by the Interstate Commerce Commission is one of first impression. We do have, however, a wealth of decisional law relating to the exempt operations of cooperatives and delimiting and proscribing the activities that may be carried on by an agricultural cooperative. Many, if not most, of those authorities seem to infer that an agricultural cooperative association, upon proper showing, may be certificated by the Interstate Commerce Commission. Indeed, the Intervening Defendant in this case, American Farm Lines, was granted emergency authority to transport Class A and B explosives, which authorization was upheld as being proper by the Supreme Court of the United States. [See American Farm Lines v. Black Ball Freight Service et al., 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547. It is true that the precise issue was not before the High Court in that case, but if any impediment to licensing existed by reason of the fact that the applicant was a cooperative, it surely would have been mentioned there. We think it noteworthy that the Congress, while considering the 1968 amendments to the Interstate Commerce Act [49 U.S.C. § 303(b)(5)], said nothing indicative of a legislative intent to prohibit agricultural cooperatives from seeking certification. Many courts, including this one, in passing upon the limitations imposed upon cooperatives and in restraining activities outside of those described in section 303(b)(5) and section 15(a) of the Agricultural Marketing Act [12 U.S.C. § 1141j(a)], have suggested that an agricultural cooperative may be certificated by holding that some hauling may not be performed "without first obtaining a certificate or permit under the provisions of the Interstate Commerce Act."

[See Munitions Carriers Conference, Inc. v. American Farm Lines, 415 F.2d 747 (CA10, 1969)]; Munitions Carriers Conference, Inc. v. American Farm Lines, D.C., 303 F.Supp. 1078, affirmed 440 F.2d 944 (CA10, 1971); Interstate Commerce Commission v. Milk Producers Marketing Company, 405 F.2d 639 (CA10, 1969); Northwest Agricultural Cooperative Association v. Interstate Commerce Commission, 350 F.2d 252 (CA9, 1965), cert. denied 382 U.S. 1011, 86 S.Ct. 620, 15 L.Ed.2d 526 (1966); Agricultural Transportation Association of Texas v. United States, 274 F.Supp. 528 (N.D.Tex., 1967); Interstate Commerce Commission v. All American Association, 281 F.Supp. 18 (N.D.Tex., 1968). Supportive of the argument that agricultural cooperatives are not disqualified from being licensed by the Interstate Commerce Commission is the legislative history of the 1968 amendments to section 203(b)(5), wherein Chairman Staggers of the House Interstate and Foreign Commerce Committee, made it clear that cooperatives were eligible to seek certification and further made it clear that the amendments were enacted only to limit the non-member transportation of goods that could be performed by a cooperative without first obtaining a certificate or permit under the provisions of the Interstate Commerce Act. [See H.R.Rep. No. 1667, 90th Cong., 2d Sess. 4 (1968); S.Rep. No. 1152, 90th Cong., 2d Sess. 10 (1968)]. Also the remarks of Representative Terry appearing at 79 Cong. Rec. p. 12,221, shed further light upon Congressional intent. He said: "Where the cooperatives go into the regular trucking business as such, * * * they should come within the provisions of the bill as to reasonable regulation."

49 U.S.C. § 303(b)(5) as amended in 1968 provides:

Vehicles excepted from operation of law

(b) Nothing in this chapter, except the provisions of section 304 of this title relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include * * *

(5) Motor vehicles controlled and operated by a cooperative association as defined in the Agricultural Marketing Act, approved June 15, 1929, as amended, or by a federation of such cooperative associations, if such federation possesses no greater powers or purposes than cooperative associations so defined, but any interstate transportation performed by such a cooperative association or federation of cooperative associations for nonmembers who are neither farmers, cooperative association, nor federations thereof for compensation, except transportation otherwise exempt under this chapter, shall be limited to that which is incidental to its primary transportation operation and necessary for its effective performance and shall in no event exceed 15 per centum of its total interstate transportation services in any fiscal year, measured in terms of tonnage: *Provided*, That, for the purposes hereof, notwithstanding any other provision of law, transportation performed for or on behalf of the United States or any agency or instrumentality thereof shall be deemed to be transportation performed for a nonmember: *Provided further*, That any such cooperative association or federation which performs interstate transportation for nonmembers who are neither farmers, cooperative associations, nor federations thereof, except transportation otherwise exempt under this chapter, shall notify the Commission of its intent to perform such transportation prior to the commencement thereof: *And provided further*, That in no event shall any such cooperative association or federation which is required hereunder to give notice to the Commission transport interstate for compensation in any fiscal year of such association or federation a quantity of property for nonmembers which, measured in terms of tonnage, exceeds the total quantity

of property transported interstate for itself and its members in such fiscal year;

From the foregoing we glean that the intent of the Congress was to define and delimit the exempt operations of agricultural cooperatives and said Act does not and was never intended to make cooperatives ineligible to obtain Commission certification.

The Plaintiffs and Intervening Plaintiffs call our attention to Geraci Contract Carrier, 7 M.C.C. 369 and Ralph A. Veon, Inc., Contract Carrier Application, 92 M.C.C. 248, and argue that under the *Geraci-Veon* rationale, an agricultural cooperative should not be certificated because such would give it an unfair advantage over the regular common carriers. Under the decision of the Commission in *Geraci-Veon*, an exempt private carrier is precluded from obtaining a certificate of convenience and necessity, but we do not believe that an agricultural cooperative presents an analogous situation. In Interstate Commerce Commission v. Milk Producers Marketing Company, supra, Judge Breitenstein said:

> The Agricultural Marketing Act declares that the policy of Congress is "to promote the effective marketing of agricultural commodities in interstate and foreign commerce" and "to protect, control, and stabilize the currents of interstate and foreign commerce in the marketing of agricultural commodities."

Further, 12 U.S.C. § 1141(a), in pertinent part, says:

> (a) It is declared to be the policy of Congress to promote the effective merchandising of agricultural commodities in interstate and foreign commerce so that the industry of agriculture will be placed on a basis of economic equality with other industries, and to that end to protect, control and stabilize the currents of interstate and foreign commerce in the marketing of agricultural commodities and their food products—

> (1) by minimizing speculation.

> (2) *by preventing inefficient and wasteful methods of distribution.* (Italics ours)

We believe that this policy is furthered where, as here, a cooperative may reduce its hauling costs both to its members and to the Department of Defense by assuring that its trucks will not be running empty in any direction. The Interstate Commerce Commission Hearing Examiner found, and the Commission agreed, that no provision of the law or public policy precludes an agricultural cooperative, upon proper showing, from obtaining certification. Among other things the Hearing Examiner found:

> The instant proceeding is distinguishable from the *Geraci-Veon* principle. Dual operations have been prohibited by the Commission under this principle where the common or contract authority is sought as an adjunct to the primary nontransportation activity of the applicant, principally where private carriers were seeking to obtain backhauls to balance their private operations. Here AFL is seeking extensive authority as a common carrier and if its application is approved, it will have all the obligations of a common carrier to move the traffic tendered for movement between the territories embraced in the application. The performance of these obligations will not depend in any way on the volume of exempt member traffic transported.

> A review of the governing statute, and its legislative history, fails to establish that the Commission is foreclosed from issuing a certification to an agricultural cooperative. It is clear from such review that the Congress, in amending section 203(b)(5) intended to, and did, fix definite limits to the operations that may be performed by cooperatives without first obtaining a certificate. Agricultural cooperatives may be certificated to perform transportation for nonmembers when the need for such service is established.

With regard to question number two we have no difficulty in finding that the fifteen percent requirement of 49 U.S.C. § 303(b)(5) means that with regard to a cooperative, all non-member hauling must be necessary and incidental to the primary transportation operations of the cooperative and in addition thereto no more than fifteen percent of its tonnage transported in any fiscal year may be devoted to goods that are non-farm related. If the cooperative also has a certificate as a common carrier, then the fifteen percent proviso is inapplicable to such certificated cooperative.

We are urged by Plaintiffs and Intervening Plaintiffs to hold that it would be contrary to the public interest and antithetical to the national transportation policy to permit an agricultural cooperative association to perform for-hire transportation in addition to hauling products of its members. Our short answer to this contention is that the Congress of the United States, which enunciates public policy, has seen fit to make no such restriction. To the contrary, 49 U.S.C. § 303(b)(5) and 12 U.S.C. § 1141j(a) both clearly authorize agricultural cooperative associations to haul for the Government.

12 U.S.C. § 1141j(a) enacted in 1929 and amended in 1931, 1933 and 1935, provides:

(a) As used in this subchapter, the term "cooperative association" means any association in which farmers act together in processing, preparing for market, handling, and/or marketing the farm products of persons so engaged, and also means any association in which farmers act together in purchasing, testing, grading, processing, distributing, and/or furnishing farm supplies and/or farm business services: *Provided, however*, That such associations are operated for the mutual benefit of the members thereof as such producers or purchasers and conform to one or both of the following requirements:

First. That no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein; and

Second. That the association does not pay dividends on stock or membership capital in excess of 8 per centum per annum.

And in any case to the following:

Third. That the association shall not deal in farm products, farm supplies, and farm business services with or for nonmembers in an amount greater in value than the total amount of such business transacted by it with or for members. All business transacted by any cooperative association for or on behalf of the United States or any agency or instrumentality thereof shall be disregarded in determining the volume of member and nonmember business transacted by such association.

We can find nothing in either of the statutes here under scrutiny that indicates a national policy prohibiting agricultural cooperatives from being certified as common carriers. Counsel for the Plaintiffs and Intervening Plaintiffs argue that a certificated cooperative would, of necessity, either fail its members by being unable to give priority to their needs, or fall short of its obligation to the public by being unable to give equal treatment to all shippers. We note that this argument was advanced and rejected by the Interstate Commerce Commission. We further note that this argument deals with prospective conjecture. The record before us tends to establish that the principal government shipper utilizing the American Farm Lines', the Department of Defense, is pleased with the services being rendered by American Farm Lines and that none of the cooperator members of the American Farm Lines has complained of the attention being given them. Suffice it to say that should the fears of Plaintiffs and Intervening

Plaintiffs in this regard develop, they can be dealt with by the Interstate Commerce Commission or by the members of the cooperative or by the Agriculture Department. We note that the certificate issued to American Farm Lines in this case contains, inter alia, the following:

IT IS FURTHER ORDERED, and is made a condition of this certificate that the holder thereof shall render reasonably continuous and adequate service to the public in pursuance of the authority herein granted, and that failure so to do shall constitute sufficient grounds for suspension, change, or revocation of this certificate.

The courts may not substitute their judgment for the judgment of the Commission, nor may the courts overturn findings of the Commission which are supported by substantial evidence. The statutory standard which governs the Commission's decision-making process is whether service applied for will serve the public convenience and necessity. 49 U.S.C.A. § 306. This standard in turn is governed by the overriding Congressional directive that the Commission shall promote the needs of commerce in the national defense. 49 U.S.C.A. § 1 et seq. In these broad standards the Commission determines whether the proposed service is needed and desired by shippers, whether the applicant is fit and capable to render service, whether the additional service will provide new and competitive improvements in the industry, and whether the service is compatible with the overall need of the motor carrier industry and the shipping public. Chesapeake and O. R. Co. v. United States, 283 U.S. 35, 51 S.Ct. 337, 75 L.Ed. 824 (1931); Pan American Bus Lines Operation, 1 M.C.C. 190 (1936); Texas Mexican Railway Company v. United States, 250 F.Supp. 946 (D.C.Tex.1966).

The evidence establishes the need of the Department of Defense for American Farm Lines' services. Due to American Farm Lines' previous extensive hauling for the Department of Defense, there has been ample opportunity for the Department of Defense to compare American Farm Lines' service with that of other carriers and conclude that it is to be preferred in many respects.

For its own purposes the Department of Defense had segregated bills relating to cooperatives. American Farm Lines combined these bills of lading with the detailed survey of delivery receipts and introduced them as evidence in order to demonstrate the speed and promptness of its service and the frequent failure of many other munitions carriers to meet the schedules of the Department of Defense. The Plaintiffs' own records establish that existing carriers had delivered commodities on the Government's specified delivery dates only seventeen percent of the time. It is true that some shipments were ahead of schedule, but this apparently caused problems. Virtually all existing service available to the Department prior to American Farm Lines' service was regular route-multi-line service. American Farm Lines' service is virtually the only single-line direct service available to the Department with the points of origin and destination and routes desired.

At the time of the proceedings in this case before the Hearing Examiner, the inadequacies of existing regular carrier service were so apparent that over one hundred seventy certified regular carriers had requested the Department of Defense to support their own applications to the Commission to change operations by permitting them to reduce transit times through the elimination of circuitous and interlining service. Twenty-nine of the Plaintiffs in this case have filed such applications in which they admitted the inadequacies.

The evidence clearly demonstrates the superiority of American Farm Lines' service.

The results of comparative studies cover movements conducted by American Farm Lines over a fifteen month period as compared with transit times of the Plaintiffs during the periods they themselves submitted. The tabular summary

of these studies shows the difference between American Farm Lines' performance and the performance of the Plaintiff carriers. In almost every case American Farm Lines' transit time is lower by several days.

It has been the Commission's policy to certificate new single-line service carriers, where it can be shown that existing multiple-line service has proved inadequate to meet the needs of its shippers, and transit times are excessive. This is particularly true if the excessive transit times cause loss of business, additional costs of inventory and warehouse space. West Brothers, Inc. v. United States, 303 F.Supp. 1171 (D.C. Miss.1969); Braswell Motor Freight Lines, Extension-Atlantic, 100 M.C.C. 482 (1966), aff'd. sub nom., United States v. Dixie Highway Express, 389 U.S. 409, 88 S.Ct. 539, 19 L.Ed.2d 639 (1967).

The Courts have held that a showing of substantial improvement over existing service is sufficient to justify single line service. Texas Mexican Railway Company v. United States, supra, 250 F.Supp. at 949. Such a showing was made in this case.

The report of the Commission indicated that the Department of Defense requires a large number of units of equipment to be constantly available to it. Due to the economics of motor common carriage, a single carrier or small number of carriers cannot be expected to provide the Department with the complete service and all the equipment that it requires. American Farm Lines will add its equipment to the pool of available equipment to assure the Department of a sufficient number of units whenever it requires equipment. The Commission balanced the needs of the Department of Defense for improved and additional service against the possibility of traffic diversion, and concluded that the possibility of diversion is outweighed by the Department's need. That expert judgment should not be disturbed by this Court, for it is precisely such a judgment which lies within the expertise and statutory responsibility of the Commission.

▆ The Commission should consider the benefits to be gained by a new carrier's competition. Chesapeake & O. R. Co. v. United States, supra. First, American Farm Lines' single-line service not only meets the need of the Department of Defense but it also creates healthy competitive responses to its innovations. For example, many of the regular carriers applied to the Commission for changed authority for single-line service to meet the challenge of American Farm Lines' superior service.

Second, American Farm Lines' rates, which have at all times been at a compensatory level, have caused rate bureaus of the truck lines to reduce rate levels to the Government, yet they still earn profits on Government carriage.

▆ American Farm Lines introduced into evidence a detailed cost analysis prepared by an expert transportation economist, William B. Sanders. He prepared this cost evidence in accordance with accepted formulas. The data of costs for movements over various routes was obtained from computer information. From this material Mr. Sanders took an average of system average mile costs, hourly costs, and line-haul costs per costs per vehicle mile. These cost studies were unrefuted. The burden of proof to establish unfair rates rests with the protesting carriers, requiring them to produce cost evidence of their own to support their claim. See Ashworth Transfer, Inc., Extension— Explosives, 111 M.C.C. 860 (1970). The *Ashworth* decision also requires that a shipper's testimony clearly identify the commodities it will ship and Plaintiffs and Intervening Plaintiffs contend that this requisite is in nowise met in the case at bar. We disagree. Exhibits were received showing the identity of many commodities shipped by the Department of Defense and we agree with the full Commission that "it would be impractical to list all commodities which it ships."

The record shows that the Plaintiffs' rates continued to be fully compensatory even though American Farm Lines' lower rates caused them to reduce their transportation charges. This caused substantial savings to the Government. The Plaintiffs acknowledge that their total revenues increased during the years since American Farm Lines has served the Government. The Plaintiffs continue to carry over ninety percent of the Government business. In any event, as the Supreme Court stated, the shipping business should not "be deprived of new and improved service because it may divert some traffic from other carriers." Schaffer Transportation Co. v. United States, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117 (1957).

49 U.S.C.A. § 22 provides:

Nothing in this chapter shall prevent the carriage, storage, or handling of property free or at reduced rates for the United States, State, or municipal governments * * *

All of the traffic involved in American Farm Lines' application moves under rate tenders submitted to the Government pursuant to Section 22—not under tariffs. Unlike regulated tariff traffic, rates under Section 22 are established in large part by competitive market forces.

The need of the Government for the service of American Farm Lines therefore legitimately includes its need for American Farm Lines' rate competition, since existing carriers did not provide such competition.

The policy underlying Section 22 is Congress' desire to provide the Government the benefits of lower rates achieved by competition. American Farm Lines' entry on the scene already has fostered the rate competition envisioned by Section 22, benefiting both the taxpayer and the national defense.

It has been consistently held by the Supreme Court and the district courts that the decision whether to grant or deny certificates of public convenience and necessity is a matter committed to the discretion of the Interstate Commerce Commission, as the Supreme Court stated in Interstate Commerce Commission v. Parker, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051 (1945):

The purpose of Congress was to leave to the Commission authoritatively to decide whether additional motor service would serve public convenience and necessity. Cf. Powell v. United States, 300 U.S. 276, 287, 57 S.Ct. 470, 81 L.Ed. 643, 651. This, of course, gives administrative discretion to the Commission, cf. McLean Trucking Co. v. United States, 321 U.S. 67, 87, 88, 64 S.Ct. 370, 88 L.Ed. 544, 556, 557, to draw its conclusion from the infinite variety of circumstances which may occur in specific instances."

■■ The courts have also recognized that, while they are not merely to "rubber stamp" the Commission's decisions, an appeal is not de novo, but is upon a record made before the Commission, whose order must be sustained if supported by substantial evidence viewed on the record as a whole. The three-judge district court in Arkansas Grain Corporation v. United States, 263 F.Supp. 480, 484 (D.C.Ark.1966) clarified the guidelines used in implementing these principles when it wrote:

"Substantial evidence" refers to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," Consolidated Edison Co. v. National Relations Board, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). "The question of the weight of the evidence is for the Commission and not for the Court," and "it is not the province of the courts to substitute their judgment for that of the Commission, and when the Commission's findings of fact are supported by substantial evidence they are not subject to review." State of Florida v. United States, 282 U.S. 194, 211–212, 51 S.Ct. 119, 124, 75 L.Ed. 291.

These rulings comport with a long line of Supreme Court decisions in which it

has been held that the Orders of the Commission should not be set aside, modified, or disturbed by a court on review if they lie within the scope of the statutory authority of the Commission and are based upon adequate findings which are supported by substantial evidence, even though the Court might reach a different conclusion on the record. Illinois Cent. R. Co. v. Norfolk & Western R. Co., 385 U.S. 57, 66, 69, 87 S.Ct. 255, 17 L.Ed.2d 162 (1966); United States v. Pierce Auto Freight Lines, 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821 (1946).

Finally, we are urged to reverse the action taken by the Commission herein for the reason, as stated by Plaintiffs and Intervening Plaintiffs, that American Farm Lines has demonstrated its unfitness to be a common carrier by violating an order of this Court issued in Munitions Carriers Conference, Inc. v. American Farm Lines, D.C., 303 F.Supp. 1078, affirmed 10 Cir., 415 F.2d 747, and being held in contempt therefor and punished accordingly. Our answer to this argument is that the Commission, not this Court, determines the fitness of applicants for Interstate Commerce Commission permits and if, as here, the Commission action is supported by substantial evidence, we are powerless to vacate it. We do not here attempt to minimize the seriousness of the contemptuous acts committed by American Farm Lines, but we believe, as the Commission found, that after several months of satisfactory performance these past acts have diminished in importance and we are unable to say that prior improper acts will brand the actor forever so as to render the actor forever unfit.

 The law is clear that, having considered all the relevant facts, the Commission has discretion to find an applicant qualified to render service despite past incidents of unauthorized carriage. B.D.C. Corp., Extension Five Counties, 99 M.C.C. 126 (1965) affirmed sub nom. Armored Carrier Corporation v. United States, 260 F.Supp. 612 (D.C.

N.Y.1966), affirmed per curiam, 386 U. S. 778, 87 S.Ct. 1476, 18 L.Ed.2d 524 (1967). As the District Court stated in *Armored Carrier* at 615 "past wilful misconduct is not, as a matter of law, sufficient to bar a grant of authority."

For the foregoing reasons, the relief sought herein by Plaintiffs and Intervening Plaintiffs is in all things denied.