**H.A. DASLER, et al.**

**v.**

**E.F. HUTTON & COMPANY, INC., and Donald M. Tidlund.**

**Civ. No. 4–85–1250.**

United States District Court,
D. Minnesota,
Fourth Division.

March 31, 1988.

Bruce C. Recher and Roy S. Ginsburg, Henson & Efron, Minneapolis, Minn., for plaintiffs.

J. David Jackson, Dorsey & Whitney, Minneapolis, Minn., for defendants.

## ORDER

ROSENBAUM, District Judge.

In this cause, plaintiffs claim the brokerage firm of defendant E.F. Hutton (Hutton), through its brokers, defendant Donald M. Tidlund (Tidlund) and Richard Lund (Lund), while acting as the investment manager of the Cornwall Clinic Profit Sharing Plan (the plan), breached its fiduciary duty under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001, *et seq.*, by excessively trading securities in the plan's account. Plaintiffs seek damages, pursuant to 29 U.S.C. §§ 1109 and 1132, for violations of duties imposed on fiduciaries under 29 U.S.C. § 1104. In their amended complaint, plaintiffs further claim defendants "churned" plaintiffs' account in violation of § 10(b) of the Securities Exchange Act of 1934 (the Exchange Act), as amended, 15 U.S.C. § 78j(b), and SEC Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5.[1]

Plaintiffs, Dr. H.A. Dasler, Dr. F.L. Whitlark, and Dr. W.R. Byrne (administrators of the Cornwall Clinic, S.C. Profit Sharing Plan and Trust), are residents of Wisconsin. Defendants are residents of

---

1. Plaintiffs had previously alleged causes of action based on Minnesota statutes, common law fraud, negligence, and breach of fiduciary duty. These claims were dismissed by this Court's order dated January 29, 1987.

Minnesota and New York. The matter in controversy exceeds $10,000, exclusive of interest and costs. The jurisdiction of this Court is properly invoked pursuant to 28 U.S.C. § 1332. This Court has subject matter jurisdiction pursuant to 29 U.S.C. §§ 1109, 1132(a)(2) and (3), 1132(e) and (f); 15 U.S.C. § 78aa; and, 28 U.S.C. § 1331.

The Court has heard and considered all of the evidence presented at trial, as well as the argument, pleadings, and memoranda of each party. This order constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure (Fed.R.Civ.P.).

*Background*

■ This action was tried before a jury and the Court. When claims within a single action are of both a legal and equitable nature,[2] the legal claim must be tried to a jury first and the equitable claim resolved subsequently. Wright and Miller, 9 *Federal Practice and Procedure: Civil* § 2305, p. 35 (1971), *citing Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959). Plaintiffs' Rule 10b–5 claim, therefore, was presented to the jury as finder of fact, and their ERISA claim was tried to the court with the jury sitting in an advisory capacity pursuant to Rule 39(c), Fed.R.Civ.P.[3, 4]

■ "When an advisory jury is used, the ultimate responsibility for findings of

fact and conclusions of law remains with the district court." *Mitchell v. Visser,* 529 F.Supp. 1034, 1036 (D.Kansas 1981); *see I.C.C. v. Southwest Marketing Association,* 315 F.Supp. 805, 807 (N.D.Tex.1970). If the issues tendered are purely equitable, the Court in its discretion may accept or disregard the jury's verdict. *Hargrove v. American Cent. Ins. Co.,* 125 F.2d 225, 228 (10th Cir.1942).

■ However, "[w]hen legal and equitable claims are tried together, the right to a jury in the legal action encompasses the issues common to both." *Lincoln v. Board of Regents of Univ. System,* 697 F.2d 928, 934 (11th Cir.1983); *see McIntosh v. Weinberger,* 810 F.2d 1411, 1429 (8th Cir.1987). Thus, to the extent that legal and equitable issues overlap, the jury's verdict on the legal claim operates as a finding of fact binding on the Court in its disposition of the accompanying equitable claim.[5] *See Dybczak v. Tuskegee Institute,* 737 F.2d 1524, 1526–27 (11th Cir.1984); *see also Lincoln,* 697 F.2d at 934; *Williams v. City of Valdosta,* 689 F.2d 964, 976 n. 11 (11th Cir.1982).

■ In this action, the jury returned a verdict which responded to several factual issues common to plaintiffs' Rule 10b–5 claim and their ERISA claim. This Court is constrained to render a judgment on plaintiffs' ERISA claim which is consistent

**2.** ERISA claims brought under 29 U.S.C. § 1132(a)(2) are equitable in nature. *See Kahnke v. Herter,* 579 F.Supp. 1523, 1528 (D.Minn.1984).

**3.** "In all actions not triable as of right by a jury, the court upon motions or of its own initiative may try any issue with an advisory jury...." Rule 39(c), Fed.R.Civ.P.

**4.** Title 29, United States Code, Section 1132, contains six civil enforcement provisions. 29 U.S.C. § 1132(a)(1)–(6). This action was brought under § 1132(a)(2). This section allows "a participant, beneficiary or fiduciary ... [to bring a civil action] for appropriate relief under ... [29 U.S.C. § 1109]."

"The right to a jury trial in statutory actions is derived from two sources: congressional intent ... and the seventh amendment guarantee of a jury trial if the statute creates rights and remedies which would constitute a suit at 'common

law.'" *Kahnke,* 579 F.Supp. at 1527. In actions brought under § 1132(a)(2), there is no right to a jury trial under either source. '*Kahnke,* 579 F.Supp. at 1526–28; *Hollenbeck v. Falstaff Brewing Corp.,* 605 F.Supp. 421, 431 (E.D.Mo.1984); *Burud v. Acme Elec. Co.,* 591 F.Supp. 238, 248 n. 9 (D.Alaska 1984).

**5.** Justification for this result rests on the doctrine of collateral estoppel which, *inter alia,* seeks to "avoid conflicting adjudications.... [P]arties should not be subject to conflicting determinations on the same point, both of which are binding...." *Solar Kinetics v. Joseph T. Ryerson & Son,* 488 F.Supp. 1237, 1243 (D.Conn.1980), *citing Heyman v. Kline,* 456 F.2d 123, 131 (2d Cir.), *cert. denied,* 409 U.S. 847, 93 S.Ct. 53, 34 L.Ed.2d 88 (1972); *see Lartius v. Iowa Dept. of Transp.,* 705 F.2d 1018, 1020 (8th Cir.1983); *see also Sisco v. J.S. Alberici Construction Co.,* 655 F.2d 146, 151 (8th Cir.), *cert. denied,* 455 U.S. 976, 102 S.Ct. 1485, 71 L.Ed.2d 688 (1982).

with the jury's determination of factual issues common to both claims.[6] *See Garza v. City of Omaha,* 814 F.2d 553, 557 (8th Cir.1987); *see also McIntosh,* 810 F.2d at 1429. With this background, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Plaintiffs, H.A. Dasler, W.R. Byrne, and F.L. Whitlark, are medical doctors who were practicing with the Cornwall Clinic, located in Amery, Wisconsin, during all times relevant to this action.

2. The Cornwall Clinic S.C. Profit Sharing Plan and Trust, established in approximately 1969, was a qualified employee benefit plan under ERISA, established and maintained pursuant to a written instrument (Amendment Restating Cornwall Clinic, S.C. Profit Sharing Plan and Trust in its Entirety, dated 4/27/77—Exhibit 2, Art. 16.3, p. 35) as required by 29 U.S.C. § 1102.

3. Plaintiffs were administrators of the plan and were named fiduciaries under the terms of the plan instrument and 29 U.S.C. § 1102(a). As named fiduciaries, plaintiffs owed fiduciary duties to the plan's participants and beneficiaries pursuant to 29 U.S.C. § 1104(a)[7] and under the terms of the plan instrument.

4. During the period relevant to this action, the plan had approximately 20 participants including the plaintiffs and other employees of the Cornwall Clinic.

5. At all times relevant to this action, Northwestern National Bank of Minnesota (Norwest) served as the trustee under the plan. From the creation of the plan until February, 1979, Norwest also acted as investment manager of the plan's assets.

6. In late 1978, plaintiffs became disenchanted with Norwest's investment performance. In January, 1979, Dr. Dasler met with defendant Tidlund and discussed the possibility of Hutton serving as investment manager for the plan.

7. Plaintiffs' investment objectives with respect to the plan were conservative in nature. On or about January 25, 1979, Tidlund and Lund met with Dr. Dasler at Hutton's Minneapolis office. They discussed various investment strategies for the plan's assets including a covered option writing investment strategy.

8. At Dasler's invitation, Tidlund travelled to Amery, Wisconsin, on January 29, 1979. Tidlund gave a presentation to plaintiffs and two of their advisors. Tidlund's presentation included a covered options program which he represented as being a conservative method for investing in the stock market. Tidlund predicted that under Hutton's management, a 15% return would be attainable. Plaintiffs have made no claim arising from this assurance.

9. After considering Tidlund's presentation, plaintiffs voted to transfer the plan's investment management function from Norwest to Hutton. In February, 1979, plaintiffs opened a plan account at Hutton and transferred approximately $185,000 to that account. Plaintiffs signed an agreement naming Tidlund as account represent-

---

**6.** These questions, common to both claims, were submitted to the jury by special interrogatory. The jury's answers, as given, follow:

Question No. 1. Did the defendants churn or excessively trade plaintiffs' account in light of plaintiffs' investment goals and objectives?
Answer No. 1. Yes.
Question No. 9. Did plaintiffs fail to mitigate their damages?
Answer No. 9. No.
Question No. 11. Did the plaintiffs waive or ratify, or were they estopped from raising, their claims against the defendants?
Answer No. 11. No.
Verdict, dated October 20, 1987.

**7.** 29 U.S.C. § 1104(a)(1) provides in relevant part:

[A] fiduciary shall discharge his ... [or her] duties with respect to a plan solely in the interest of the participants and beneficiaries and—
(A) for the exclusive purpose of:
 (i) providing benefits to participants and their beneficiaries; and
 (ii) defraying reasonable expenses of administering the plan;
(B) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent ... [person] acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....

ative for the plan, allowing Hutton to function as the investment manager of the plan with discretionary authority to invest the plan's assets.

10. From March, 1979, through March, 1981, Hutton managed the plan's account. Hutton made decisions concerning which stocks to purchase and sell, which options to purchase and sell, when to do so, and the price at which such securities should be purchased and sold, all without the prior approval or knowledge of the plaintiffs.

11. According to Norwest reports concerning the plan's account, the plan earned an annual return of approximately 7.27% for the year ending December 31, 1979, it earned approximately 2.7% for the year ending December 31, 1980, and lost money during the first quarter of 1981.

12. Hutton used three investment strategies with the plan's account. During relevant portions of the first year, a covered option writing investment strategy was used. During the second year, a common stock purchase and sale strategy was used. Beginning in January, 1981, the stock positions were generally liquidated and placed in money market funds.

13. Richard Lund was primarily responsible for making investment decisions for the plan's account. Lund was assisted by Tidlund with whom he consulted concerning the purchase and sale of stocks and options. Tidlund and Lund functioned as a partnership, splitting the commissions they generated on the plan's account. The partnership dissolved in June, 1980.

14. During the time Hutton managed the plan's account, Hutton was paid commissions of approximately $64,000. The plan paid these commissions to Hutton following each stock or option transaction in the plan's account.

15. During the time the plan's account was at Hutton, plaintiffs received from Hutton 1) written confirmations concerning each purchase or sale (Exhibit 12); 2) monthly statements listing the past month's transactions (Exhibit 11); 3) quar-

terly reports concerning the status of the plan's account for the quarter ending September and December, 1979, and March, June, and September, 1980 (Exhibits 67, 69, 75, 76, and 77); and 4) an annual report detailing the net profit and loss on each opened and closed trade made during 1979, and providing a cumulative net profit or loss figure for the year (Exhibit 70).

16. On occasion, in either face-to-face discussions or by telephone conferences, Lund and/or Tidlund discussed matters concerning the plan's account with Dr. Dasler. Dasler functioned as the plan's primary contact person with Hutton.

17. During the period relevant to this action, the plan's trustee, Norwest, also provided plaintiffs information concerning transactions in the plan's account. Norwest provided plaintiffs the following written material: 1) confirmations, detailing the terms of each trade (this practice was terminated in April, 1980) (Exhibit 73); 2) monthly statements listing the past month's transactions by Hutton, and the current financial status of each security held in the account (Exhibit 13); 3) annual reports for the year 1979, 1980, and 1981, detailing all trades, the profit and loss incurred, along with the current financial status of each security held, plus a financial summary (Exhibits 15, 16, and 18).

18. On or about March 19, 1981, plaintiffs received a letter from Robert W. Edgar, Jr., of Norwest (Exhibit 31). This letter indicated that the rate of return for the plan for the year ending December 31, 1980, was 2.7%, and for this time frame the Standard & Poors index increased 32.5%, the Dow Jones Industrial Average increased 22.2%, and some of the bank's funds outperformed these indexes. At the end of March, 1981, Dasler directed Hutton to sell all the remaining stocks in the plan's account and transfer them to Norwest Bank.

19. The plan's attorney was Robert Hartman of the Lindquist & Vennum law firm. As part of his representation, Hartman prepared the plan's Form 5500's [8] for

---

**8.** Form 5500's are annual reports required to be filed with the Secretary of Labor pursuant to 29

U.S.C. §§ 1023 and 1024. "[A] Form 5500 must include, *inter alia,* a statement of assets and

plan years ending December 31, 1979, (Exhibit 24), December 31, 1980, (Exhibit 25), and December 31, 1981, (Exhibit 26).

20. In July, 1982, while preparing the form 5500 for the year ending December 31, 1981, Hartman determined the plan had sustained a loss approximating $47,000 in closed out securities transactions during the first three months of 1981, and that Hutton received commissions of $9,700 during the same three month period. Hartman concluded there were irregularities in the volume of trading and handling of the plan's investments by Hutton. On July 21, 1982, Hartman notified Dr. Byrne of his findings (Exhibit 102).

21. Under Hutton's management, the plan purchased and sold 69 different stocks, sold options against several of the stocks, and from time to time available cash was invested in Norwest short term investment funds.

22. In the first six months of the plan's account at Hutton, the defendant initiated a covered option writing investment strategy. Under this strategy, call options were sold against stocks purchased for the plan. Beginning in October, 1979, the defendants determined that the covered option strategy was no longer advisable because of market conditions. The defendant cut back on its options activity and increased direct purchase and sale of stocks. The last call option sold in the plan's account was sold in February, 1980. The option positions which existed at the end of February, 1980, were closed out in March, 1980, by purchasing calls. Thereafter, Hutton purchased and sold common stocks.

23. Plaintiffs' expert, Gordon Alexander, Ph.D. (Alexander), testified that from October 1, 1979, through February, 1981, given plaintiffs' investment objectives, trading in the plan's account was excessive. In arriving at this conclusion, Alexander considered 1) the trading volume on the basis of turnover rate on a monthly basis and an annualized basis by month, 2) the commission equity ratio, and 3) in and out trading (Exhibits 142, 143, and 144).

24. Alexander testified that the annualized turnover rate for stocks and options during this seventeen month period was 412% (Exhibit 146).

25. Alexander testified concerning commission-equity ratio, also referred to as a cost-equity maintenance factor. This ratio measures the percentage of the plan's assets paid to a broker on an annualized basis in the form of commissions. Alexander testified that for stocks and options during the 17 month period, from October 1, 1979, through February 1981, the commission-equity ratio for the plan was 14.8% (Exhibit 146). The plan, then, had to earn 14.8% annually on its investments simply to pay the commissions generated by Hutton.

26. Alexander further testified that the majority of the trading in the plan's account was done on a short term basis. During this seventeen month period, there were approximately 94 completed transactions (purchase and sale) of stocks, of which 83 transactions were completed within six months (88%), 65 within three months (69%), and 20 (21%) within one month (Exhibit 144).

27. Plaintiffs introduced evidence of the annualized turnover rates for 1979, 1980, and 1981 of 22 mutual funds which Hutton recommended to customers during this time frame. Sixteen of these mutual funds were described as having "growth and current income" objectives and six of these funds were characterized as "balanced funds" where stocks and corporate bonds were primarily purchased for these types of funds.

The Court finds the "growth and current income" fund objectives most closely resembled the plan's conservative investment objectives. The average of the annualized turnover rates for the growth and current income funds was 29.6% for 1979, 36.8% for 1980, and 35.8% for 1981. The comparison between the plan's account and these mutual funds reveals that the trading level

liabilities, a statement of changes in net assets available for plan benefits, a statement of income and expenses, and the terms and amount of any indebtedness." *Fink v. National Savings and Trust Co.,* 772 F.2d 951, 956 (D.C.Cir.1985); *see* 29 U.S.C. § 1023(b)(2) and (3).

based on an annualized turnover rate for the plan was 10 to 11 times higher for comparable time periods than the average of the growth and current income funds.

28. During the latter part of 1979 and 1980, the stock market was volatile. During this period, Hutton increased the trading level of the plan's account. Generally, Hutton did not invest a significant percentage of the plan's assets in money market funds which, during the period, provided high returns with minimal risk. Hutton and its representatives received no commissions for the plan's purchase and sale of money market funds through the bank.

29. The value of the plan's account as of October 1, 1979, was $210,323. This sum was incremented by plaintiff's monthly plan contributions from October 1, 1979, through February, 1981, in the total amount of $42,500. At the close of defendant's management on February 28, 1981, the value of the account was $236,580.

30. The Standard & Poors 500 Composite Index (the S & P index or the S & P) is a broad based stock market index. Nearly all of the stocks purchased in the plan are among those included in the S & P. During the period from October 1, 1979, through February, 1981, the S & P index rose 21%.[9]

31. Since March 1, 1981, under management other than by the defendants, the rate of return earned by the plan is approximately 11.5% on an annualized basis.

Based upon the prior findings of fact, the Court makes the following:

*Conclusions of Law*

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S. C. §§ 1331 and 1332 and 29 U.S.C. § 1132(e)(1) and (f).

2. The Cornwall Clinic profit sharing plan was an employee benefit plan for the purposes of ERISA. 29 U.S.C. § 1002(3).[10]

3. As investment manager of the plan, Hutton was a fiduciary under ERISA,[11] owing fiduciary duties to the plan's participants under 29 U.S.C. § 1104.[12]

For this case, the key provisions of 29 U.S.C. § 1104 are those which impose three different, although overlapping, standards. First, under § 1104(a)(1) "a fiduciary must discharge his duties 'solely in the interests of the participants and beneficiaries.' [Second, under § 1104(a)(1)(A)(i),] [h]e must do this 'for the exclusive purpose' of providing benefits to them." *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir., *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *see also Leigh v. Engle,* 727 F.2d 113, 123 (7th Cir.1984). Third, under § 1104(a)(1)(B), a fiduciary must discharge his duties " 'with the care, skill, prudence and diligence' that a prudent person, 'familiar with such matters,' would employee if acting under similar circumstances." *Donovan v. Estate of Fitzsimmons,* 778 F.2d 298, 302 (7th Cir.1985). These "fiduciary standards 'must be enforced with uncompromising rigidity.' " *NLRB v. Amax Coal Co.,* 453 U.S. 322, 329–34, 101 S.Ct. 2789, 2794–96, 69 L.Ed.2d 672 (1981), *quoting Meinhard v. Salman,* 249 N.Y. 458, 164 N.E. 545, 546 (1928); *see also Donovan,* 778 F.2d at 302; *Eaves v. Penn,* 587 F.2d 453, 462 (10th Cir.1978); *Marshall v.*

---

**9.** The S & P closed on October 1, 1979, at 108.56; December 31, 1979, at 107.94; December 31, 1980, at 135.76, and Friday, February 27, 1981, at 131.27. Standard and Poors Corporation, Daily Stock Price Record of the New York Stock Exchange, Oct.–Dec. 1979 ed., Oct.–Dec. 1980 ed., Jan.–March 1981 ed. The Court takes notice of these figures as published in the Daily Stock Price Record of the New York Stock Exchange.

**10.** 29 U.S.C. § 1002(3) provides:
The term "employee benefit plan" . . . means an employee welfare plan or an employee pension benefit plan or a plan which is both an employee welfare benefit plan and an employee pension benefit plan.

**11.** In this case, the parties have stipulated that both plaintiffs and defendants are fiduciaries with respect to the plan. Under 29 U.S.C. § 1002(21)(A), "a person is a fiduciary with respect to a plan to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets."

**12.** *See supra* n. 7.

*Snyder,* 572 F.2d 894, 901–902 (2d Cir. 1978).

■ "At the heart of the fiduciary relationship is the duty of complete and undivided loyalty" to the participants and beneficiaries of the plan. *Freund v. Marshall and Ilsley Bank,* 485 F.Supp. 629, 639 (W.D.Wisc.1979). "In the classic description of then-Judge Cardozo:

> Many forms of conduct permissible, in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A ... [fiduciary] is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior...."

*Freund,* 485 F.Supp. at 639, *quoting Meinhard v. Salman,* 249 N.Y. 458, 164 N.E. 545 (1929). A fiduciary must act with an "eye single to the interests of the participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d at 271.

■ 4. Based upon findings of fact numbered 13, 14, 23, 24, 25, 26, 27, and 28, the evidence concerning the plan's high annualized turnover rate, the commission-equity ratio, the in-and-out trading, and in consideration of the plaintiffs' conservative investment objectives, the Court finds that during the period of October 1, 1979, through February 28, 1981, excessive trading took place in the plan's account. *See Mihara v. Dean Witter and Co., Inc.,* 619 F.2d 814, 819 (9th Cir.1980).

This excessive trading, coupled with the relatively small level of the plan's assets invested in money market funds for which no commissions were paid to defendants, leads the Court to conclude that defendants considered their own interests and commission income when making investment decisions for the plan.

During this seventeen month period, defendants' conduct fell short of the high standard of behavior required by 29 U.S.C. § 1104. Defendants breached their fiduciary duty under ERISA for two reasons: first, because they failed to act with the sole and exclusive purpose of providing benefits to the plan participants and of defraying reasonable expenses of administrating the plan; and, second, because defendants failed to act prudently as the level of commissions was unreasonable. From the foregoing, the Court concludes defendants failed to exercise the care, skill, prudence, and diligence demanded by § 1104(a)(1).

5. This action is authorized by 29 U.S.C. § 1132(a)(2).[13] Subsection (a)(2) allows a plan participant, beneficiary, or fiduciary to seek relief under 29 U.S.C. § 1109 for violations of fiduciary duties.

■ 6. Suits for breach of fiduciary duty must be brought within ERISA's statute of limitation, 29 U.S.C. § 1113.[14] Section 1113 generally establishes a six year limitation period in which to initiate an action, measured from the date of the last action constituting a breach or violation. The statute provides two exceptions to the six year limitation period, setting a limit of three years where 1) the plaintiff had actual knowledge of a breach or violation, or 2) the plaintiff obtained a report from which plaintiff could reasonably be expected to have obtained knowledge of such breach or violation. *See Fink v. National Savings and Trust Co.,* 772 F.2d 951, 956 (D.C.Cir. 1985).

---

13. 29 U.S.C. § 1132 provides in relevant part:
(a) ... [a] civil action may be brought—
....
(2) by ... a participant, beneficiary or fiduciary for appropriate relief under section 409 [29 U.S.C. § 1109]; ....

14. 29 U.S.C. § 1113 provides in relevant part:
[(a)] No action may be commenced ... with respect to a fiduciary's breach of any responsibility, duty, or obligation ... after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation ... or
(2) three years after the earliest date
(A) on which the plaintiff had actual knowledge of the breach or violation, or
(B) on which a report, from which he could reasonably be expected to have obtained knowledge of such breach or violation, was filed with the Secretary under ... [ERISA].

The first exception provides that any lawsuit alleging breach of fiduciary duty must be commenced within three years from the time the plaintiffs obtained actual knowledge of the breach or violation. The second exception provides that any lawsuit alleging breach of fiduciary duty must be commenced within three years from the time the plaintiffs reasonably should have been expected to have obtained knowledge of the breach from a Form 5500 [15] filed under 29 U.S.C. §§ 1023 and 1024. *See Fink v. National Savings and Trust,* 772 F.2d 951, 956 (D.C.Cir. 1985).

The Court concludes plaintiffs had actual knowledge of defendants' breach or violation when plaintiffs received attorney Hartman's letter on or about July 21, 1982, informing them of Hartman's perceived irregularities in trading and handling the plan's investments by Hutton (Exhibit 102). Under the actual knowledge provisions of § 1113(a)(2)(A), plaintiffs have made a timely complaint. Whether plaintiffs are to be charged with constructive knowledge of defendants' breach or violation as provided for in § 1113(a)(2)(B) depends on the particular facts and circumstances present in this case. *See Dzenits v. Merrill, Lynch, Pierce, Fenner and Smith, Inc.,* 494 F.2d 168, 172 (10th Cir.1974). After reviewing the Form 5500 prepared for the plan year ending December 31, 1979, the Court concludes it disclosed insufficient information to put a reasonable person on notice that Hutton had breached its fiduciary duties. Plaintiffs' claim is timely filed under 29 U.S.C. § 1113.

7. The jury considered ratification, waiver, and estoppel under the Rule 10b–5 claim and found no bar to plaintiffs' claims. As discussed above, the jury's finding on these factual issues is binding on this Court.[16] The Court finds there is sufficient evidence to support the jury's verdict. Plaintiffs' ERISA claim is not barred by waiver, estoppel, or ratification.

The jury further determined, on evidence the Court finds sufficient, that the plaintiffs did not fail to mitigate their damages. This jury finding is binding on this Court. The Court concludes plaintiffs acted reasonably and did not fail to mitigate damages sustained by the plan.

8. Title 29, United States Code, Section 1109, "provides for personal liability of the fiduciary for losses resulting from his or her breach of fiduciary duty, requires the fiduciary to restore to the plan profits made through use of plan assets and subjects the fiduciary to such other equitable or remedial relief as the court may deem appropriate." *Kahnke v. Herter,* 579 F.Supp. 1523, 1527 (D.Minn.1984).[17] "The primary purpose of ERISA is to protect the interests of the plan beneficiaries, and the disgorgement requirements of § 1109(a) are intended to promote their interests by removing the fiduciary's incentives to misuse trust assets." *Leigh v. Engle,* 727 F.2d 113, 139 (7th Cir.1984).

Section 1109(a) makes it " 'clear that Congress intended to provide the courts with broad remedies for redressing the interests of participants and beneficiaries when they have been adversely affected by breaches of a fiduciary duty.' " *Donovan v. Bierwirth,* 754 F.2d 1049, 1055 (2d Cir. 1985), *quoting Eaves v. Penn,* 587 F.2d 453, 462 (10th Cir.1978). "In developing a law of remedies, the Congress intended the federal courts to draw on principles of traditional trust law ... [which] provides for broad and flexible equitable remedies in cases involving breaches of fiduciary duty.

15. *See supra* n. 8.

16. *See supra* n. 5 and n. 6.

17. 29 U.S.C. § 1109 provides in relevant part: (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate....
29 U.S.C. § 1109(a).

In addition to specific remedies for recovery of profits obtained by fiduciaries by use of plan assets, trust law provides the alternative remedy of restoring plan participants to the position in which they would have occupied but for the breach of trust." *Eaves*, 587 F.2d at 462; *see Donovan v. Bierwirth*, 754 F.2d at 1056; *see also* Restatement (Second) of Trusts § 205(c) (1959).

In order to measure the plan's "losses" applicable under § 1109(a), the Court must compare the plan's actual earnings under Hutton's management during the excessive trading period with those earnings which would have been reasonable had the plan's account not been excessively traded. *See Donovan v. Bierwirth*, 754 F.2d at 1056. Doubts resulting from difficulty in determining damages as a result of a fiduciary's breach should be resolved in favor of the plan. *Leigh*, 727 F.2d at 138–39.

9. The Court concludes that excessive trading and commissions paid to Hutton caused losses to the plan. These losses can be clearly seen in relation to the overall market as exemplified by the Standard & Poors 500 Composite Index. The plan's loss is properly measured by the difference between the plan's actual performance during the period of excessive trading and that amount it would have earned during this period as measured and adjusted by the movement of an appropriate index reflecting the stock market. The Court finds the S & P to be such an appropriate index.[18] *See Donovan v. Bierwirth*, 754 F.2d at 1056; *see also Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 327–29 (5th Cir.1981).

Using the S & P index to measure the performance of the market during this 17 month period, and adjusting for the $2,500 monthly contributions made to the plan, the plan's account should have been worth $280,829 as of February 28, 1981.[19] The difference between the plan's actual performance and the reasonable return as exemplified by the S & P index is $44,249.

But for the defendant's excessive trading and commissions, the plan would have had this $44,249 available since March 1, 1982. Since leaving Hutton's management, the plan's annual rate of return has averaged approximately 11.5%. The Court finds it is reasonable to assume the plan would have invested the $44,249, and that; and over the six years since the plan was removed from defendants' control, it would have appreciated at the same 11.5% annual rate as those funds which remained in the plan. The net sum lost as a result of the defendants' acts, then, is equal to $85,026.

16. During the 17 months of its plan management, Hutton received commissions on transactions in the plan's account of $49,286 (Exhibit 147). These commissions are Hutton's "profits" for purposes of § 1109(a).

17. The sum of losses sustained by the plan and the profits derived by defendants' breach equals $134,312.[20]

Accordingly, IT IS ORDERED that:

Plaintiffs shall have and recover from defendants the sum of $134,312.

LET JUDGMENT BE ENTERED ACCORDINGLY.

**18.** *See supra* finding of fact number 30.

**19.** *See* Damage Calculation appended to this order as Appendix A.

**20.** Plaintiff further requests an award of punitive damages. The Court notes that Eighth Circuit law is not presently fully developed as to whether punitive damages are or are not available under ERISA. The Court of Appeals in *Dependahl v. Falstaff Brewing Corp.*, 653 F.2d 1208, 1216 (8th Cir.), *cert. denied*, 454 U.S. 968 and 1084, 102 S.Ct. 512 and 641, 70 L.Ed.2d 384 (1981), stated "punitive damages are ... [not] provided for in ERISA." The court of Appeals in *Hollenbeck v. Falstaff Brewing Corp.*, 780 F.2d 20, 21 (8th Cir.1985), however, expressly reserved the question of whether punitive damages may be recovered in an ERISA action. In this action, plaintiffs presented no evidence which suggests to the Court that E.F. Hutton's actions were either malicious or in wanton disregard of the beneficiaries' rights under the plan. Therefore, in this case punitive damages would not be appropriate based on the evidence and the Court declines to order the same.

## APPENDIX A
### DAMAGE CALCULATION FOR THE PLAN

1. Value of the account on October 1, 1979: $210,323.

2. Adjust the value of the account for subsequent contributions to the account and movement in the S & P:

| Period Covered | Beg. Bal. | | Plus Ave.* Contrib. | | Plus/Minus Change in S & P | | Adjusted Value |
|---|---|---|---|---|---|---|---|
| 10/01/79 12/31/79 | $210,323 | + | $ 3,750 | — | ($214,073 × .006) | = | $212,789 |
| 01/01/80 12/31/80 | $212,789 | + | $15,000 | + | ($227,789 × .260) | = | $287,014 |
| 01/01/81 02/27/81 | $287,014 | + | $ 2,500 | — | ($289,514 × .030) | = | $280,829 |

3. Loss measured by S & P: Subtract actual value of account on February 28, 1981, ($236,580 (Exhibit 147)) from S & P adjusted value as of the close on Friday, February 27, 1981, ($280,829) resulting in a loss of $44,249.

* "Average contribution" is equal to one-half of the period.
$2,500 per month contributions made during